SUSAN C. CAMPION ET AL. *v.* BOARD OF ALDERMEN
OF THE CITY OF NEW HAVEN ET AL.
(AC 24360)

Lavery, C. J., and Schaller and Peters, Js.

Argued March 30—officially released November 9, 2004

*John M. Gesmonde*, for the appellants (plaintiffs).

*Barbara M. Schellenberg*, with whom were *Frank S. Marcucci* and, on the brief, *Austin K. Wolf*, for the appellee (defendant Anthony DelMonaco Family Limited Partnership et al.).

*Philip R. Pastore III*, deputy corporation counsel, for the appellee (named defendant et al.).

*Opinion*

LAVERY, C. J. The plaintiffs[1] appeal from the judgment of the trial court dismissing their appeal from the decision by the defendant board of aldermen of the city

___

[1] The plaintiffs, property owners in the Morris Cove section of New Haven, are Susan C. Campion, Daniel J. Maffeo, Jr., Robert Tigelaar, Mary T. Tigelaar, Adrea M. Nardini, Cynthia Smith, Sandra Wilson, Marcella A. Mascola and David L. Kronberg. The trial court found that all of the plaintiffs were statutorily aggrieved. See General Statutes § 8-8.

of New Haven[2] to approve an application for a planned development district.[3] The dispositive issue in this appeal is whether any enabling authority exists for § 65 of the New Haven zoning ordinance, which provides for the creation of the planned development district approved by the board of aldermen.[4] We conclude that there is no such enabling authority and, accordingly, reverse the judgment of the trial court.

A detailed recitation of the facts and procedural history is necessary for our resolution of the plaintiffs' appeal. The defendants Antonio DelMonaco and Anna DelMonaco owned approximately 1.727 acres in New Haven, designated as 208 Cove Street.[5] At that site, they operated a catering facility known as Anthony's Oceanview, Inc., as a preexisting nonconforming use. Over the course of several years, the defendant Anthony DelMonaco Family Limited Partnership (partnership)

[2] The other defendants named in the complaint were New Haven mayor John DeStefano, Jr., the Anthony DelMonaco Family Limited Partnership, Antonio DelMonaco and Anna DelMonaco.

[3] We recently described a planned development district as "a creature not normally spotted in Connecticut's jurisprudential forests." (Internal quotation marks omitted.) *Blakeman* v. *Planning & Zoning Commission*, 82 Conn. App. 632, 637 n.7, 846 A.2d 950, cert. denied, 270 Conn. 905, 853 A.2d 521 (2004).

[4] The plaintiffs also claim on appeal that § 65 of the New Haven zoning ordinance represents an invalid delegation of arbitrary power and is so unreasonably vague as to be void and unconstitutional, and that the approval of the planned development district was not given on the basis of substantial evidence. We do not reach those issues in view of our decision on the dispositive issue.

Additionally, we point out that the plaintiffs dispute the trial court's conclusion that the board of aldermen acted in its legislative capacity when it acted on the planned development district application. Subsequent to the submission of briefs and oral argument in the present case, we squarely addressed and resolved that issue in *Blakeman* v. *Planning & Zoning Commission*, 82 Conn. App. 632, 846 A.2d 950, cert. denied, 270 Conn. 905, 853 A.2d 521 (2004), in which we held that when a zoning authority is presented with an application for a planned development district, it acts in a legislative, rather than administrative, capacity. See id., 643.

[5] The property also is known as 450 Lighthouse Road.

purchased several abutting properties. Those abutting properties, located at 30 and 36-50 Morris Cove Road, and 1, 5 and 7 Bristol Place, totaled approximately 2.35 acres.

In an application dated April 16, 2001, the partnership requested the creation of a planned development district that would consolidate all six parcels. The size of the planned development district would be 4.04 acres and would be carved out of the surrounding RS-2 zoning district.[6] In the application, the partnership proposed a two phase plan for the implementation of the planned development district. During the first phase, certain structures, including the Cove Manor Convalescent Nursing Home (convalescent home), a preexisting, nonconforming use, and three residential structures would be demolished. Furthermore, enlargements and renovations to the catering facility would be completed, including the construction of a new parking facility and a garden reception area. During the second phase, a new residence would be constructed for the DelMonaco family.

The decision to apply for the planned development district originated from a prior request filed by the partnership for a special exception for permission to expand parking at the catering facility by using the convalescent home parking lot. During that time, the New Haven

---

[6] Section 12-2 of the New Haven zoning ordinance provides in relevant part: "[RS-2] districts exist for the protection of areas, most of them large in size, that have been and are being developed predominantly for single family dwellings. Accordingly, the use of land and buildings within such areas is limited to single-family detached dwellings, and to such non-residential uses as generally support and harmonize with a low-density residential area. The non-residential uses permitted in RS-2 Districts, subject to adequate conditions and safeguards, are hereby found and declared to be the only appropriate such uses for such areas. It is hereby found and declared, further, that these regulations are necessary to the protection of these areas and that their protection is essential to the maintenance of a balanced community of sound residential areas of diverse types."

zoning board of appeals found that the convalescent home had not been abandoned and denied the special exception application. The partnership appealed the matter to the Superior Court. By way of a stipulation dated December 15, 2000, the partnership and the zoning board of appeals reached an agreement. The stipulation granted the catering business permission to use the convalescent home's parking lot on a temporary basis and required the partnership to apply for the creation of a planned development district. The proposed planned development district, if approved, would result in the creation of a new zoning district and an amendment to the zoning map.

The New Haven city plan commission (commission)[7] held public hearings on the partnership's application on June 13 and July 25, 2001. The plans for the planned development district, as submitted by the partnership, included a structure to enclose the garden at the catering facility and the reconfiguration of the existing parking lot. The capacity of the catering facility would be increased from 299 persons to 470 persons with the addition of a garden pavilion. Additionally, nearly 100 new parking spaces would be created.

On September 19, 2001, the commission approved the application and imposed certain conditions, including a

---

[7] Section 64.D of the New Haven zoning ordinance provides in relevant part that "[p]etitions for amendment of the . . . zoning map shall be filed with the City Clerk for transmission to the Board of Aldermen, and shall thereafter be referred and acted upon by the City Plan Commission and the Board of Aldermen as provided in sections 183 and 184 of the New Haven Charter. . . ."

Article XXXI, § 183, of the New Haven code provides in relevant part that the commission "shall recommend the boundaries of districts and appropriate regulations and restrictions to be enforced herein. . . ." Furthermore, § 184 provides that no change to the regulations or zoning districts may be made without referral to the commission.

We also note that § 65 of the New Haven zoning ordinance requires the commission to recommend the planned development district favorably prior to approval by the board of aldermen.

limitation of the size of the new building, the number of parking spaces, the hours of operation and project phasing. The commission forwarded its report and approval to the board of aldermen.[8] On February 19, 2002, the board of aldermen substantially amended the conditions of approval for the planned development district. Specifically, the board of aldermen made the following amendments: (1) no change to the size of the catering facility was permitted at that time; (2) the number of parking spaces was limited to 199; (3) the maximum occupancy was limited to 299 persons; (4) separate functions in the garden area were prohibited; (5) the 0.67 acres for the DelMonaco family residence was excluded from the planned development district; (6) the permitted hours of operation were established; (7) a five year moratorium was placed on expansion, improvement or modification within the district; and (8) the board of aldermen reserved the right to extend and to review the five year moratorium.

The plaintiffs appealed from the board of aldermen's decision to the Superior Court, which dismissed the appeal. The court first determined that the board of aldermen had acted in a legislative capacity because the approval of the district created a new zone.[9] The court then rejected the plaintiffs' claims that the approval of the district violated the provisions of the special act by which the city of New Haven exercises its zoning powers. Specifically, the plaintiffs had argued that § 65 of the zoning ordinance delegated powers to the board of aldermen and to the New Haven zoning board of appeals in a manner not authorized by the 1925 special act that amended the 1921 legislation granting zoning authority to the city of New Haven. The court

[8] Prior to consideration by the board of aldermen, the aldermanic committee on legislation reviewed the commission's report and reported on it favorably after two public hearings.

[9] See footnote 4.

noted that a planned development district is neither a variance nor a special exception and, therefore, not a matter for the New Haven zoning board of appeals.[10] The court concluded that § 5 of No. 490 of the 1925 Special Acts; 19 Spec. Acts 1006, No. 490 (1925) (Spec. Acts No. 490); authorized the board of aldermen, on a favorable recommendation by the commission, to change or to alter the zoning districts. The court observed that the commission favorably recommended the planned development district and that the board of aldermen had examined the commission's report critically, requiring substantial amendments to it before final approval. Thus, the court found that the creation of the planned development district did not violate the terms of the 1925 special act.

The court also rejected the plaintiffs' claims that the approval of the planned development district violated the uniformity requirement found in § 1 of the 1925 special act or that the approval constituted spot zoning. Specifically, the court noted that the 1925 special act's uniformity requirement requires only intradistrict uniformity, not uniformity with neighboring districts and that the approval resulted in a new zoning district, designated as a planned development district. The court denied the spot zoning claim on the grounds that the new planned development district eliminated the convalescent home, a nonconforming use, and was in accordance with the city's comprehensive plan.

The court also did not accept the plaintiffs' claim that § 65 of the zoning ordinance was vague and therefore

[10] Section 63 of the New Haven zoning ordinance provides that the New Haven zoning board of appeals operates pursuant to § 185 of the New Haven charter. The New Haven zoning board of appeals is responsible for, inter alia, the review of administrative orders made by zoning officers, except for decisions concerning the historic district commission, and decisions on whether to grant variances and special exceptions. The decision to grant or to deny a planned development district is a legislative, rather than an administrative, decision and accordingly does not involve the New Haven zoning board of appeals.

illegal. The court noted that specific standards are required for the approval of a new planned development district, including a traffic analysis, the submission of a general plan, various public hearings and the submission of a detailed plan. Last, the court determined that substantial evidence supported the board of aldermen's decision. Subsequent to the court's dismissal of their appeal, the plaintiffs appealed to this court. Additional facts will be set forth as necessary.

I

At the outset, a review of the history of the zoning powers unique to the city of New Haven provides necessary background for our discussion. "Municipalities in Connecticut may exercise zoning power either by adopting the provisions of chapter 124 of the General Statutes, §§ 8-1 through 8-13a, or by enacting a municipal charter authorized by a special act of the legislature." *Smith* v. *Zoning Board of Appeals*, 227 Conn. 71, 81 n.7, 629 A.2d 1089 (1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1190, 127 L. Ed. 2d 540 (1994); see also T. Tondro, Connecticut Land Use Regulation (2d Ed. 1992) pp. 39-41. "The power to adopt and administer zoning regulations was conferred by the General Assembly for the first time in this state in 1921 by special act applicable only to the city of New Haven. 18 Spec. Laws 1045. . . . In spite of this early legislation bestowing broad zoning powers upon municipalities, many cities and towns have sought and obtained zoning powers by special enactments of the General Assembly applicable only to them. Consequently, two bodies of legislation pertaining to zoning have developed over the years: the one, contained in the General Statutes; the other, conferred by special act and relevant only to the particular city or town in whose behalf the legislation was adopted. These two bodies of statute law differ in many respects, including the right to, and the procedure for, an appeal to the courts from a decision of a local zoning

agency." (Citations omitted.) *Sullivan* v. *Town Council*, 143 Conn. 280, 282–83, 121 A.2d 630 (1956).

In 1925, the General Assembly amended the 1921 special act applicable to the city of New Haven. See Spec. Acts No. 490. That act has not been amended by the General Assembly and presently remains as the operative legislation.[11] Section 1 of the 1925 special act authorizes the board of aldermen to divide the city into various zoning districts. Section 4 provides that "[t]he commission shall recommend the boundaries of the districts and appropriate regulations and restrictions to be enforced therein. Such commission shall make a tentative report and hold a hearing thereon." Spec. Acts No. 490, § 4. The commission is then required to submit a report to the board of aldermen for a determination. Section 5 provides in relevant part that "[t]he regulations imposed and districts created under the provisions of this act may be changed or altered from time to time by ordinance, but no such change or alteration shall be made until the proposed change shall have been referred to the zoning commission for a hearing. . . ." Spec. Acts No. 490, § 5. We also note that art. XXXI, §§ 177–184, of the New Haven charter essentially tracks the relevant portions of the 1925 special act.

We now turn to the planned development district regulation found in § 65 of the New Haven zoning ordinance. Section 65.A provides in relevant part: "The provisions of this section are to be applied in instances where tracts of land of considerable size are developed, redeveloped or renewed as integrated and harmonious

---

[11] The difficulties of enabling legislation such as the 1925 special act, which has not been amended, was recognized more than fifty years ago and, as evidenced in this case, time has validated that concern. "The case is a typical illustration of a problem confronting municipalities where zoning ordinances were adopted twenty-five years ago and have not been followed by a thorough resurvey and by amendment." *McMahon* v. *Board of Zoning Appeals*, 140 Conn. 433, 443, 101 A.2d 284 (1953) (*Quinlan, J.*, dissenting).

units, and where the overall design of such units is so outstanding as to warrant modification of the standards contained elsewhere in this ordinance. A planned development [district], to be eligible under this section, must be: 1. in accordance with the comprehensive plans of the City, including all plans for redevelopment and renewal; 2. composed of such uses, and in such proportions, as are most appropriate and necessary for the integrated functioning of the planned development and for the city; [and] 3. so designed in its space allocation, orientation, texture, materials, landscaping and other features as to produce an environment of stable and desirable character, complementing the design and values of the surrounding neighborhood, and showing such unusual merit as to reflect credit upon the development and upon the city . . . ." Section 65.B provides that a proposed planned development district that includes structures other than dwellings must be at least two acres in size.

Section 65.D of the New Haven zoning ordinance details the procedure an applicant must follow to obtain a planned development district. In addition to a mandatory traffic study, each application "shall state the proposed modifications of existing zoning, and shall be accompanied by General Plans, including contoured site plans. The General Plans shall show the improvements to be erected upon the tract, the open spaces to be provided, the nature and location of the proposed use or uses, the relationship of the proposed development to surrounding properties, and other pertinent information. . . ."

Subject to certain exceptions not applicable to the present case, a planned development district application is submitted to the board of aldermen for consideration.[12] In some circumstances, the application is

[12] Certain applications made pursuant to § 65 of the New Haven zoning ordinance are treated as special exceptions and are filed with the zoning board of appeals. See New Haven Zoning Ordinance § 65.D.1.

submitted to the zoning board of appeals. Under the facts of the present case, however, the application and general plan were submitted to the board of aldermen properly. The board of aldermen may approve the application only after the receipt of a favorable recommendation from the commission, a report from the department of traffic and parking, and specific findings that all of the conditions found in § 65.A will be met.

## II

Having set forth the unique zoning authority of the city of New Haven, we now turn to additional legal principles that assist in the resolution of the plaintiffs' appeal. We first set forth the applicable standard of review and certain general legal principles applicable to the present case. We then must review the history of certain zoning concepts in Connecticut, namely, the introduction of various land use devices that have been authorized and utilized.

## A

We start by identifying the applicable standard of review. We have identified the dispositive issue as whether there is authority for § 65 of the New Haven zoning ordinance. That requires us to engage in statutory interpretation primarily of the 1925 special act, but also, to a lesser extent, of General Statutes § 8-2.[13] "Because this issue raises a question of statutory interpretation, our review is plenary. . . . A fundamental tenet of statutory construction is that statutes are to be considered to give effect to the apparent intention of the lawmaking body. . . . The meaning of a statute

[13] We acknowledge that zoning in New Haven is controlled by the 1925 special act. We also discuss General Statutes § 8-2, which has been amended several times and provides broader powers to municipalities that have adopted chapter 124 of the General Statutes. We conclude that even under the broader framework of § 8-2, the type of planned development district as set forth in § 65 of the New Haven zoning ordinance is not authorized.

shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. Public Acts 2003, No. 03-154, § 1." (Citations omitted; internal quotation marks omitted.) *Carmel Hollow Associates Ltd. Partnership* v. *Bethlehem*, 269 Conn. 120, 129, 848 A.2d 451 (2004).

B

We now identify general legal principles that assist us in the resolution of the present appeal. "It is axiomatic that all private property is held subject to the police power of the state. . . . When and how that power will be exerted is for the legislative body to decide, and courts can interfere only where the action taken fails to serve a legitimate public purpose or interferes with private rights in an unreasonable, discriminatory or arbitrary fashion. . . . Zoning legislation, be it statute or ordinance, to be constitutionally valid must serve some phase of the public health, safety, convenience or welfare in a reasonable, impartial and considerate way. . . . If the legislation is an ordinance, it must comply with, and serve the purpose of, the statute under which sanction is claimed for it. . . . When the issue whether the zoning legislation does serve the public welfare is fairly debatable, courts cannot place their judgment above that of the legislative body which enacted it. (Citations omitted; internal quotation marks omitted.) *Clark* v. *Town Council*, 145 Conn. 476, 482–83, 144 A.2d 327 (1958); see also *Cohen* v. *Hartford*, 244 Conn. 206, 218, 710 A.2d 746 (1998); *Aunt Hack Ridge Estates, Inc.* v. *Planning Commission*, 160 Conn. 109, 117, 273 A.2d 880 (1970).

Modern district zoning emanates from a case decided in 1926 by the United States Supreme Court. "Zoning

as a form of land use control was approved by the United States Supreme Court in *Village of Euclid, Ohio* v. *Ambler Realty Co.*, [272 U.S. 365, 47 S. Ct. 114, 71 L. Ed. 303 (1926)], which formed the basis for dividing land in a municipality into districts and restricting the types of uses allowed in each district. This concept of geometric mapping of districts on zoning maps of the municipality brought the concept that has persisted since then known as 'Euclidian' zoning." R. Fuller, 9 Connecticut Practice Series: Land Use Law and Practice (2d Ed. 1999) § 1.1, p. 2. "Euclidian zoning is defined as the division of a municipality into districts, classified by height limitations, use limitations, and other regulations regulating the bulk, density, and minimum acreage of a parcel." B. Burke, Understanding the Law of Zoning and Land Use Controls (2002) p. 187; see also R. Fuller, supra, § 3.5, p. 29.

The Maryland Court of Appeals aptly has described Euclidian zoning: "Zoning is concerned with dimensions and uses of land or structures. . . . Euclidean zoning is a fairly static and rigid form of zoning . . . . The term Euclidean zoning describes the early zoning concept of separating incompatible land uses through the establishment of fixed legislative rules. . . . Each district or zone is dedicated to a particular purpose, either residential, commercial, or industrial, and the zones appear on the municipality's official zoning map. . . . Euclidian zoning is designed to achieve stability in land use planning and zoning and to be a comparatively inflexible, self-executing mechanism which, once in place, allows *for little modification beyond self-contained procedures for predetermined exceptions or variances.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Mayor & Council of Rockville* v. *Rylyns Enterprises, Inc.*, 372 Md. 514, 533–34, 814 A.2d 469 (2002); see also *Wheaton Moose Lodge No. 1775* v. *Montgomery County*, 41 Md. App. 401,

403, 397 A.2d 250 (1979) (Euclidian zoning a practical method of categorizing land uses in terms of relative offensiveness to each other and protecting uses within community).

C

To ameliorate the inevitable difficulties stemming from Euclidian zoning's adherence to rigid, delineated zones and their accompanying uses, various mechanisms have been authorized by the General Assembly to help local zoning boards accommodate the wide ranging local conditions that exist throughout the state and do not fit neatly into district zoning. Absent such authority from the General Assembly, a municipality would be powerless to enact those mechanisms. "[I]t is equally settled that a municipality, as a creation of the state, has no inherent powers of its own, and has only those powers expressly granted to it by the state or that are necessary for it to discharge its duties and carry out its purposes." *Ganim* v. *Smith & Wesson Corp.*, 258 Conn. 313, 367, 780 A.2d 98 (2001).

Our Supreme Court's decision in *Pecora* v. *Zoning Commission*, 145 Conn. 435, 144 A.2d 48 (1958), is the appropriate starting point for our discussion of the genesis of those land use mechanisms. In *Pecora*, our Supreme Court held, inter alia, that the intradistrict uniformity requirement applied only to buildings and structures, not uses of land. Id., 441. In response to the *Pecora* decision, the legislature enacted, in 1959, an amendment to General Statutes § 8-2, which added the following italicized language: "[A]nd, within such [zoning] districts, [a zoning commission] may regulate the erection, construction, reconstruction, alteration or use of buildings or structures and the use of land. All such regulations shall be uniform for each class or kind of buildings, structures *or use of land* throughout each district, but the regulations in one district may differ

from those in another district *and may provide that certain classes or kinds of buildings, structures or use of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission, combined planning and zoning commission or zoning board of appeals, whichever commission or board the regulations may designate, subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. . . .*"[14] (Emphasis in original.) Public Acts 1959, No. 614, § 2.

Our Supreme Court subsequently recognized the intent of the General Assembly to overrule, by way of legislation, the holding of *Pecora* with respect to the intradistrict uniformity requirement. "The *Pecora* case was decided in July, 1958. We can assume that the legislature was aware of the interpretation which we placed on the statute. . . . The plain purpose of the legislature in adopting the 1959 amendment to § 8-2 of the General Statutes was to provide a means by which the result reached by us in the *Pecora* case could be accomplished whether the zoning requirement affected buildings and structures or land uses. The insertion of the phrase 'or use of land' in the third sentence of § 8-2 is clear evidence of an intention to require that regulations for the use of land, like regulations for each class of buildings or structures, be uniform. This change in the statute was made to eliminate the distinction

[14] The uniformity requirement achieves several goals. "By requiring uniform treatment of similar properties within a district, possibilities for arbitrary decisions are reduced; the zoning commission 'preapproves' the uses permitted in a district without reference to particular owners. Property owners also have greater assurances about the future uses of land in the neighborhood. One of the primary goals of zoning, the stabilization of land uses, is furthered because it is more difficult to amend regulations affecting many property owners." T. Tondro, supra, p. 73. Nevertheless, the benefit of stability and neutrality results in a corresponding loss in flexibility. Id.

which had been drawn by us in the *Pecora* case." (Citations omitted.) *Summ* v. *Zoning Commission*, 150 Conn. 79, 86, 186 A.2d 160 (1962).

Our Supreme Court also recognized that as a result of the 1959 amendment, the General Assembly authorized the use of special exceptions. "At the same time, however, the legislature added the provision authorizing the adoption by a zoning commission of regulations which would allow a use subject to standards set forth in the regulations and under special conditions, after the obtaining of a special permit. *The power of local zoning authorities was thus broadened, and they were allowed to impose certain standards and conditions on the use of property when the public interest required it.*" (Emphasis added.) Id. Other land use tools to harmonize diverse local conditions with the set standards of Euclidian zoning include floating zones, variances and nonconforming uses. A brief and cursory review of those concepts is necessary to distinguish why those are enabled properly and the planned development district regulation found in § 65 of the New Haven ordinance is not enabled.

1

We previously have noted that General Statutes § 8-2 explicitly enables the use of special exceptions.[15] "A special [exception] allows a property owner to use his property in a manner expressly permitted by local zoning regulations. . . . The proposed use, however, must satisfy standards set forth in the zoning regulations themselves as well as the conditions necessary to protect the public health, safety, convenience and property values. . . . An application for a special permit seeks permission to vary the use of a particular piece of prop-

---

[15] A special exception is known interchangeably as a special permit. *A. Aiudi & Sons, LLC* v. *Planning & Zoning Commission*, 267 Conn. 192, 195 n.4, 837 A.2d 748 (2004).

erty from that for which it is zoned, without offending the uses permitted as of right in the particular zoning district. . . . When a special permit is issued, the affected property may be allowed an exception to the underlying zoning regulations, but it continues to be governed in the same manner as provided in the overall comprehensive plan. . . .

"The basic rationale for the special permit . . . is that while certain land uses may be generally compatible with the uses permitted as of right in a particular zoning district, their nature is such that their precise location and mode of operation must be individually regulated because of the particular topography, traffic problems, neighboring uses, etc., of the site." (Citation omitted; internal quotation marks omitted.) *Oakbridge/ Rogers Avenue Realty, LLC* v. *Planning & Zoning Board*, 78 Conn. App. 242, 246, 826 A.2d 1232 (2003); see also R. Fuller, supra, § 3.7, pp. 30–31.

"General Statutes § 8-2 (a) authorizes municipal zoning commissions to enact regulations providing that certain . . . uses of land are permitted only after obtaining a special permit or special exception from a zoning commission . . . . General Statutes § 8-2 (a) further provides that the obtaining [of] a special permit or special exception . . . [is] subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. Thus, in accordance with § 8-2 (a), an applicant's obtaining of a special exception pursuant to a zoning regulation is subject to a zoning commission's consideration of these general factors." (Internal quotation marks omitted.) *A. Auidi & Sons, LLC* v. *Planning & Zoning Commission*, 267 Conn. 192, 205–206, 837 A.2d 748 (2004).

The General Assembly authorized the use of special exceptions via the 1959 amendment to General Statutes

§ 8-2. R. Fuller, supra, § 3.7, p. 30; see also *Summ* v. *Zoning Commission*, supra, 150 Conn. 86–87. That concept represents a compromise between the relative inflexible structure of Euclidian zoning and the impermissible favoritism, corruption and violations of the uniformity requirement that could stem from a pure case-by-case approach. Put another way, it provides a local zoning agency with some flexibility while maintaining standards applicable to all members of the municipality.

With respect to special exceptions in the city of New Haven, § 1 of the 1925 special act provides in relevant part that "[r]egulations may be imposed in each district specifying the uses that shall be excluded or subjected to reasonable requirements of a special nature . . . ." Spec. Acts No. 490, § 1. That language, similar to the language later used in the 1959 amendment to General Statutes § 8-2, is the source of authority for § 63.D of the New Haven zoning ordinance, which details the use of special exceptions in New Haven.

Section 63.D provides in relevant part that "[t]he development and execution of a comprehensive zoning ordinance is based upon the division of the city into districts, within which the use of land and structures and the bulk and locations of structures in relation to the land are substantially uniform. It is recognized, however, that there are certain uses and features which, because of their unique characteristics, cannot be distinctly classified or regulated in a particular district or districts, without consideration, in each case, of the impact of such uses and features upon neighboring uses and the surrounding area, compared with the public need for them at particular locations. Such uses and features are therefore treated as special exceptions."

Subsection three of § 63.D sets out specific standards for the New Haven zoning board to consider when

determining whether a special exception is necessary. Those standards include: "a) the nature of the proposed site, including its size and shape and proposed size, shape and arrangement of the structures; b) the resulting traffic patterns and adequacy of proposed off-street parking and loading; c) the nature of the surrounding area and the extent to which the proposed use or feature might impair its present and future development; d) the proximity of dwellings, churches, schools, public buildings and other places of public gatherings; e) all standards contained in this ordinance; and f) the comprehensive plan of the City of New Haven, and other expressions of the purpose and intent of this ordinance." Thus, both enabling authority and defined standards exist for the use of special exceptions in the city of New Haven.

2

The next land use mechanism to be discussed is floating zones. "A floating zone is a special detailed use district . . . . It differs from the traditional Euclidean zone in that it has no defined boundaries and is said to float over the entire area where it may eventually be established. . . . The legality of this type of zoning, when properly applied, has been recognized by [our Supreme Court]." (Citations omitted; internal quotation marks omitted.) *Schwartz* v. *Town Plan & Zoning Commission*, 168 Conn. 20, 22, 357 A.2d 495 (1975); see also R. Fuller, supra, § 3.8, pp. 32–34. A floating zone does not have predesignated boundaries; rather it is a district listing specific permitted uses. B. Burke, supra, p. 193.

Floating zones are similarly authorized by the 1959 amendment to General Statutes § 8-2. Although that legislation did not use the term "floating zone," our Supreme Court has held that the broad language of the post-1959 statute enabled their use. *Sheridan* v.

*Planning Board,* 159 Conn. 1, 18, 266 A.2d 396 (1969); see also R. Fuller, supra, § 3.8, p. 33.

"While the concept of a floating zone is similar to the established power of a zoning board to grant special exceptions, the two types of regulation may be distinguished. The special exception is the product of administrative action, while the floating zone is the product of legislative action. . . . Further, if a landowner meets the conditions set forth for a special exception, the board is bound to grant one, but in the case of a floating zone discretion is maintained and additional limitations may be imposed—more control is retained by the zoning board because it is acting legislatively." (Internal quotation marks omitted.) *Homart Development Co.* v. *Planning & Zoning Commission,* 26 Conn. App. 212, 215–16, 600 A.2d 13 (1991).

Nevertheless, special exceptions and floating zones are similar in that they represent a means to reduce the formal structure of Euclidian district zoning. The most serious objections to the use of a floating zone, which is that it is a response to development pressures and leads to favoritism, are theoretically offset by the potential for greater flexibility than ordinary zoning procedures. T. Tondro, supra, p. 71. Additionally, floating zones, before they are approved by the local zoning body, must set out details regarding the use, size and form of the structures before they may be implemented. Those requirements serve to prevent an arbitrary change to a local community. As our Supreme Court has stated: "[A] floating zone provides more control over changes than does the granting of special exceptions . . . with no greater likelihood of creating incompatible uses, and with no less forewarning than precedes the granting of a special exception." *Sheridan* v. *Planning Board,* supra, 159 Conn. 17.

We conclude that the language contained in the 1925 special act authorizes the use of floating zones in the

city of New Haven, just as our Supreme Court did with respect to the city of Stamford. In *Sheridan*, our Supreme Court rejected the argument that the Stamford special act, 26 Spec. Laws 1234, No. 619, § 550, did not authorize floating zones in that city. *Sheridan* v. *Planning Board*, supra, 159 Conn. 17. It cited the following language in the Stamford special act as enabling the use of floating zones: "[T]he zoning board is authorized to regulate the height, number of stories and size of buildings and other structures; the percentage of the area of the lot that may be occupied; the size of yards, courts and other open spaces; the density of population and the location and use of buildings, structures and land for trade, industry, residence or other purposes; and the height, size, location and character of advertising signs and billboards." (Internal quotation marks omitted.) Id., 17–18. Nearly identical language is found in § 1 of the New Haven special act. Thus, it is clear that the use of floating zones in New Haven is proper.

3

A third land use mechanism that allows for some variation of the strict application of district zoning is a variance. "The power of [a local zoning body] to vary the application of the zoning regulations is fixed by General Statutes § 8-6 . . . . A hardship which under the statute would permit the [local zoning body] to vary the application of the zoning regulations must differ in kind from the hardship imposed on properties in general by the regulations." *Murphy, Inc.* v. *Board of Zoning Appeals*, 147 Conn. 358, 360, 161 A.2d 185 (1960); see also T. Tondro, supra, pp. 122–23.

General Statutes § 8-6 (a) provides in relevant part that "[t]he zoning board of appeals shall have the following powers and duties . . . (3) to determine and vary the application of the zoning bylaws, ordinances or regulations in harmony with their general purpose and

intent and with due consideration for conserving the public health, safety, convenience, welfare and property values solely with respect to a parcel of land where, owing to conditions especially affecting such parcel but not affecting generally the district in which it is situated, a literal enforcement of such bylaws, ordinances or regulations would result in exceptional difficulty or unusual hardship so that substantial justice will be done and the public safety and welfare secured, provided that the zoning regulations may specify the extent to which uses shall not be permitted by variance in districts in which such uses are not otherwise allowed. . . ."

With respect to zoning in the city of New Haven, § 1 of the 1925 special act provides in relevant part that "[s]uch regulations may provide that [a zoning] board of appeals may determine and vary their application in harmony with their general purpose and intent and in accordance with general or specific rules therein contained." Spec. Acts No. 490, § 1. On the basis of that enabling authority, § 63.C of the New Haven zoning ordinance allows the zoning board of appeals to grant a variance under appropriate conditions. "Where there is difficulty or unreasonable hardship in the way of carrying out the strict letter of the zoning ordinance, the Board of Zoning Appeals shall have the power in a specific case to vary the application of any provision of the ordinance, if such variance will be in harmony with the general purpose and intent of the ordinance and if the public health, safety and general welfare will be served and substantial justice done." New Haven Zoning Ordinance § 63.C.1.

The standards by which a local zoning board of appeals may grant a variance have been developed in the case law of this state. See generally R. Fuller, supra, § 9.1 et seq. We recognize that the question of whether the granting of a variance was proper is not always clear; nevertheless, a zoning board of appeals should

grant a variance only in exceptional or unusual circumstances. *Kalimian* v. *Zoning Board of Appeals*, 65 Conn. App. 628, 631, 783 A.2d 506, cert. denied, 258 Conn. 936, 785 A.2d 231 (2001). "Proof of exceptional difficulty or unusual hardship is absolutely necessary as a condition precedent to the granting of a zoning variance. . . . A mere economic hardship or a hardship that was self-created, however, is insufficient to justify a variance . . . and neither financial loss nor the potential for financial gain is the proper basis for granting a variance." (Internal quotation marks omitted.) *Dupont* v. *Zoning Board of Appeals*, 80 Conn. App. 327, 330, 834 A.2d 801 (2003). A voluntarily assumed hardship cannot form the basis that would warrant the granting of a variance. *Spencer* v. *Zoning Board of Appeals*, 15 Conn. App. 387, 389–90, 544 A.2d 676 (1988). Last, we note that the "hardship that justifies a zoning board's decision to grant a variance must arise from the ordinance itself, rather than from the subjective choices of the applicant." *Kalimian* v. *Zoning Board of Appeals*, supra, 633.

Professor Terry J. Tondro has indicated that the variance power is neither broad nor generalized; instead, it must be used in the narrowest manner possible to serve its purpose. T. Tondro, supra, p. 124. As this brief overview indicates, strict standards govern the application of the use of a variance to prevent the exception from Euclidian zoning from becoming the rule.

4

Last, we discuss nonconforming uses. "A nonconformity has been defined as a use or structure [that is] prohibited by the zoning regulations but is permitted because of its existence at the time that the regulations [were] adopted. . . . For a use to be considered nonconforming . . . that use must possess two characteristics. First, it must be *lawful* and second, it must be

*in existence* at the time that the zoning regulation making the use nonconforming was enacted." (Emphasis added; internal quotation marks omitted.) *Horace* v. *Salem Zoning Board of Appeals,* 85 Conn. App. 162, 165 n.5, 855 A.2d 1044 (2004).

Nonconforming uses are protected by the express language of General Statutes § 8-2.[16] See *Crabtree Realty Co.* v. *Planning & Zoning Commission,* 82 Conn. App. 559, 562, 845 A.2d 447, cert. denied, 269 Conn. 911, 852 A.2d 739 (2004). To be sure, "[i]t is the indisputable goal of zoning to reduce nonconforming to conforming uses with all the speed justice will tolerate. . . . While [t]he accepted policy of zoning . . . is to prevent the extension of nonconforming uses . . . legally existing nonconforming uses are property rights vested in the land. . . . [T]he rule concerning the continuance of a nonconforming use protects the right of a user to continue the same use of the property as it existed before the date of the adoption of the zoning regulations." (Citations omitted; internal quotation marks omitted.) *Northeast Parking, Inc.* v. *Planning & Zoning Commission,* 47 Conn. App. 284, 294, 703 A.2d 797 (1997), cert. denied, 243 Conn. 969, 707 A.2d 1269 (1998); see also T. Tondro, supra, p. 146.

Standards have been developed with respect to the continuation of nonconforming uses. "Once a nonconforming use is established, the only way it can be lost is through abandonment." *Taylor* v. *Zoning Board of Appeals,* 65 Conn. App. 687, 695, 783 A.2d 526 (2001). The issue of a specific intent to relinquish a nonconforming use presents a question for the trier of fact.

[16] General Statutes § 8-2 provides in relevant part that "[s]uch regulations shall not prohibit the continuance of any nonconforming use, building or structure existing at the time of the adoption of such regulations. Such regulations shall not provide for the termination of any nonconforming use solely as a result of nonuse for a specified period of time without regard to the intent of the property owner to maintain that use. . . ."

See *Cumberland Farms, Inc.* v. *Zoning Board of Appeals*, 74 Conn. App. 622, 631, 814 A.2d 396, cert. denied, 263 Conn. 901, 819 A.2d 836 (2003).

The nonconforming use differs from the other land use mechanisms discussed in that it is a restriction on the powers of a local land use body, rather than an authorization to enact change proactively. Nevertheless, nonconforming uses, like special exceptions, floating zones and variances, represent a legislative compromise between structured, Euclidean district zoning, and the need to vary the strict and unyielding uniformity that results therefrom without running afoul of the prohibition against unfettered, standardless case-by-case analysis. Simply put, before a zoning body can utilize its authority to make such a use conform to the principles of district zoning, a certain standard, honed in our jurisprudence over the course of years of judicial interpretation, must be met, namely, sufficient facts must establish that the owner intended to abandon the nonconforming use.

III

After detailing the origins and developments of the relevant land mechanisms, authorized by statute or special act and subject to set standards, we finally address the dispositive question, which is whether a source of enabling authority exists for § 65 of the New Haven zoning ordinance. We conclude that the 1925 special act does not provide authority for § 65. Furthermore, even considering the more expansive language contained in General Statutes § 8-2, we conclude that § 65 exceeds even that broad language.

The 1925 special act does not contain the term "planned development district" or a definition of that concept. That fact distinguishes special exceptions and variances, which are named or defined in the 1925 special act, from a planned development district. To be

sure, it is axiomatic that it is well within the province of the General Assembly to amend the statutes and to authorize specifically the use of planned development districts. As we have noted, subsequent to our Supreme Court's decision in *Pecora* v. *Zoning Commission*, supra, 145 Conn. 435, the legislature amended General Statutes § 8-2 to require intradistrict uniformity with respect to uses.[17] Nevertheless, the legislature has not amended the 1925 special act, and it remains the operative authority for zoning in New Haven.

We acknowledge that the absence of express language alone does not result in a conclusion that § 65 lacks enabling authority. See T. Tondro, supra, pp. 42–44 ("[y]et a long list of zoning techniques and objectives [has] been approved by Connecticut courts even though no specific statutory language authorizes them"). As we described in part II C 2, floating zones are not named or identified in the 1925 special act. Nevertheless, our Supreme Court, in interpreting the Stamford special act, held that the broad language found in General Statutes § 8-2 and the Stamford special act enabled the use of a floating zone. See *Sheridan* v. *Planning Board*, supra, 159 Conn. 17–18. Similar language found in the 1925 special act authorizes the use of floating zones in New Haven. Thus, the question that remains in this case is whether the text of the 1925 special act or General Statutes § 8-2 is sufficiently broad to enable planned development districts under § 65.

The factor that distinguishes floating zones, and to a lesser extent special exceptions, variances and non-

---

[17] A more recent example of legislative action that overrides a decision from our Supreme Court may be found in Public Acts 2004, No. 04-209, was which was enacted in response to our Supreme Court's decision in *AvalonBay Communities Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 832 A.2d 1 (2003); see also *State* v. *O'Neil*, 65 Conn. App. 145, 170, 782 A.2d 209 (2001), aff'd, 262 Conn. 295, 811 A.2d 1288 (2003).

846

conforming uses,[18] as proper land use mechanisms from a planned development district as provided for by § 65 of the New Haven zoning ordinance, is the presence of set and established standards. A floating zone is a "special, detailed use district . . . which *the proposed kind, size and form of structures must be preapproved. It is legislatively predeemed compatible* with the area in which it eventually locates *if specific standards* are met and the particular application is not unreasonable." (Emphasis added; internal quotation marks omitted.) *Schwartz* v. *Town Plan & Zoning Commission,* supra, 168 Conn. 22. Our Supreme Court has emphasized the importance of the standards with respect to floating zones. See, e.g., *Dooley* v. *Town Plan & Zoning Commission,* 154 Conn. 470, 477, 226 A.2d 509 (1967) (floating zone subject to specific, stringent limitations and required developer to submit detailed plans as adequate safeguard). Those standards temper the broad language contained in General Statutes § 8-2 and the special acts that enable the use of a floating zone under the proper circumstances. Similarly, a zoning board of appeals may grant a variance or special exception only when certain defined conditions, such as a hardship unique to the land or a special use limited to legislatively determined standards, are met. To establish a nonconforming use, the property owner must prove that certain conditions

[18] We recognize that litigation often involves the determination of whether a local zoning board properly granted a special permit or variance, or whether an alteration of a nonconforming use is appropriate. Nevertheless, the jurisprudence of those subject areas has developed certain standards, and the legislature has not amended the General Statutes in light of those judicial opinions. "While we are aware that legislative inaction . . . is not necessarily legislative affirmation . . . we also presume that the legislature is aware of [our Supreme Court's] interpretation of a statute, and that its subsequent nonaction may be understood as a validation of that interpretation." (Internal quotation marks omitted.) *Bergeson* v. *New London,* 269 Conn. 763, 780, 850 A.2d 184 (2004); see also *State* v. *Hodge,* 248 Conn. 207, 262–63, 726 A.2d 531, cert. denied, 528 U.S. 969, 120 S. Ct. 409, 145 L. Ed. 2d 319 (1999); *State* v. *Denson,* 67 Conn. App. 803, 812, 789 A.2d 1075, cert. denied, 260 Conn. 915, 797 A.2d 514 (2002).

have been met, such as the continued use of property that had been legal prior to the establishment of zoning.

Such standards are absent in the New Haven planned development district regulation. We conclude that § 65 of the New Haven zoning ordinance, as drafted, fails to contain uniform standards that would apply to each planned development district and that, absent those standards of uniformity, there is no authority in either the 1925 special act or the New Haven charter for the use of a planned development district. Unlike a floating zone, in which only certain preapproved uses are permitted, § 65 allows the board of aldermen nearly unlimited discretion as long as the subject area is of sufficient size.[19]

---

[19] That concern, as applied to a Shelton planned development district, was set forth by the Superior Court in *Mileski* v. *Planning & Zoning Commission*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-89-0030284S (July 24, 1990). In *Mileski*, Judge Robert A. Fuller stated that "[w]hile it is not necessary to resolve it, there is a serious question concerning the source of the [planned development district] procedure itself. While zoning commissions have broad authority given to them by the General Statutes, that authority is not unlimited." Id. The court noted that the General Assembly amended § 8-2 to allow special exceptions, and the courts approved the use of floating zones on the ground that floating zones are limited to particular approved uses. Id. "However, the [planned development district] provisions in § 34 are not provisions for a floating zone. *Unlike a floating zone, [the planned development district] does not contain particular types of uses that are preapproved for placement on particular properties at a later date. Under § 34, the commission has virtually unlimited discretion on what to allow for a [planned development district], and it can always fall back on § 34.8 in denying one. Under that section, virtually any use could be established as a permitted use in another zoning district, in either an existing district or one specially created for the purpose. Related to this, § 34 contains inadequate, vague standards to determine when a [planned development district] will be allowed.* . . . The [planned development district] procedure is not consistent with § 8-2, conflicts with the uniformity provision in that statute and is not authorized by chapter 124 [of the General Statutes]." (Emphasis added.) Id.

Although *Mileski* referred to the Shelton planned development regulation, we conclude that the concerns raised with respect to the lack of standards apply to § 65 of the New Haven zoning ordinance. In the present case, Robert A. Fuller, the author of a treatise on Connecticut land use and acting as a private attorney, submitted an advisory opinion on behalf of the plaintiffs

We reiterate in relevant part the standards set forth in § 65.A: "A planned development district . . . must be . . . 1. in accordance with the comprehensive plans of the City, including all plans for redevelopment and renewal; 2. composed of such uses, and in such proportions, as are most appropriate and necessary for the integrated functioning of the planned development and for the city; [and] 3. so designed in its space allocation, orientation, texture, materials, landscaping and other features as to produce an environment of stable and desirable character, complementing the design and values of the surrounding neighborhood, and showing such unusual merit as to reflect credit upon the development and upon the city . . . ."

That listing of vague, general policies fails to provide sufficient safeguards against the arbitrary application and use of § 65. Furthermore, § 65 lacks sufficient details to inform not only the members of the board of aldermen, but also the public, as to what changes to the zoning map are permitted. Taken to an extreme, a developer could apply for a planned development district that would place a rendering plant on two acres in the heart of a residential zone as long as the commission and the board of aldermen found that this plant met the vague standards contained in § 65. Those standards, with the exception of the two acre requirement, have no uniform requirement of any kind for planned development districts. As pointed out in the plaintiffs' brief, the § 65 standards do not detail any requirements for bulk, setback, uses, coverage, off-street parking, performance (air, light, noise and odor), utilities or consideration of natural features or integration of architectures

---

to the board as to the legality of § 65. He opined that "there is no authorization for it by statute, and apparently none by any special act concerning zoning in New Haven. . . . The main zoning statute is section 8-2, which is very similar (and even more extensive) than the powers to zone in the 1925 special act, but has no provision for this type of land use control. . . ." Fuller also objected to the lack of standards contained in § 65. We agree.

with the existing area. We agree that the absence of standards gives the commission and board of aldermen standardless discretion when considering a planned development district. That result is the antithesis of Euclidian zoning, which is the basis of both the 1925 special act and General Statutes § 8-2.

The vagueness of those standards in § 65 is demonstrated by the fact that the board of aldermen determined that the removal of three residences from a residential neighborhood, the removal of an unused convalescent home and the expansion of a parking lot constituted the requisite showing of "unusual merit as to reflect credit upon the developer and upon the city . . . ." New Haven Zoning Ordinance § 65.A.3.

We also have concerns that the lack of adequate standards provided a means for contract zoning[20] and spot zoning,[21] both of which are impermissible in this

[20] Contract zoning occurs when "an agreement is entered between the ultimate zoning authority and the zoning applicant/property owners which purports to determine contractually how the property in question will be zoned, in derogation of the legal prerequisites for the grant of the desired zone. Absent valid legislative authorization, it is impermissible because it allows a property owner to obtain a special privilege not available to others . . . disrupts the comprehensive nature of the zoning plan, and, most importantly, impermissibly derogates the exercise of the municipality's powers." (Citation omitted.) *Mayor & Council of Rockville* v. *Rylyns Enterprises, Inc.*, supra, 372 Md. 547. Contract zoning is not permitted in Connecticut. See R. Fuller, supra, § 4.5, p. 56.

[21] "Our courts consistently have invalidated zoning decisions that have constituted spot zoning. [S]pot zoning is the reclassification of a small area of land in such a manner as to disturb the tenor of the surrounding neighborhood. . . . Two elements must be satisfied before spot zoning can be said to exist. First, the zone change must concern a small area of land. Second, the change must be out of harmony with the comprehensive plan for zoning adopted to serve the needs of the community as a whole." (Citation omitted; internal quotation marks omitted.) *Michel* v. *Planning & Zoning Commission*, 28 Conn. App. 314, 319, 612 A.2d 778, cert. denied, 223 Conn. 923, 614 A.2d 824 (1992). "The vice of spot zoning lies in the fact that it singles out for special treatment a lot or a small area in a way that does not further such a [comprehensive] plan." (Internal quotation marks omitted.) *Bradley* v. *Zoning Board of Appeals*, 165 Conn. 389, 393, 334 A.2d 914

state. Zoning power is used to regulate the use of the land and not the user of the land. T. Tondro, supra, p. 88. For example, variances cannot be personal in nature and may be based only on property conditions. See *Garibaldi* v. *Zoning Board of Appeals*, 163 Conn. 235, 239, 303 A.2d 743 (1972).

In the present case, § 65 appears to have been used as a means for the board of aldermen to grant special zoning of a personal nature to the partnership. The partnership previously applied for a special exception to increase the parking at the catering facility by using the parking lot at the convalescent home. The zoning board of appeals denied that request. The partnership filed an appeal to the Superior Court, Docket No. CV-99-0424005S. The appeal settled and never reached a judicial conclusion; instead, the zoning board of appeals and the partnership entered into an agreement allowing for the use of the parking lot at the convalescent home under the condition that the partnership apply for a planned development district. The planned development district approved by the board of aldermen provided for an increase in the size of the catering facility's parking lot and the real possibility, at the conclusion of the five year moratorium, of an increase in the size of the catering facility itself unless affirmative steps were taken by the board of aldermen. Thus, the partnership entered into a bargaining session with the zoning board of appeals, and the resulting stipulation gave the partnership precisely what it had been denied—the use of the parking lot at the convalescent home on the condition that the partnership apply for a planned development district. On its face, that appears to be an example of contract zoning.

(1973). Spot zoning is not permitted in Connecticut. *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 161, 292 A.2d 893 (1972).

The use of § 65 in this case also appears to have resulted in spot zoning.[22] The "comprehensive plan is to be found in the zoning regulations themselves and the zoning map, which are primarily concerned with the use of property." *Damick* v. *Planning & Zoning Commission*, 158 Conn. 78, 81, 256 A.2d 428 (1969). The area from which the planned development district was carved out is nearly exclusively residential. As a result of the approval of the planned development district, in addition to the removal of the convalescent home, three residential structures would be demolished and a larger commercial parking lot built. The approval also created the probability that in five years the commercial catering facility would be greatly enlarged. The partnership argues that one nonconforming use, the convalescent home, is simply being replaced by another, the expanded parking lot. Thus, according to the partnership, there is no net change to the nature and tenor of the neighborhood. We disagree with that argument.[23] In late 1998 or early 1999, the zoning board of appeals found that the convalescent home had not been abandoned, even though it was closed for a considerable amount of time. Although there has been no subsequent finding of no abandonment by the commission or the board of aldermen since early 1999, the parties agree that the convalescent home has been closed since the prior finding of no abandonment. Although it is not for this court to make the factual

---

[22] The size of the planned development district is 3.37 acres, and a parcel that size meets the first element of spot zoning. In *Langer* v. *Planning & Zoning Commission*, 163 Conn. 453, 461, 313 A.2d 44 (1972), the parcel in question was about six acres. Our Supreme Court stated that "[i]t [was] apparent that the first test [of spot zoning was] met." Id.; see also *Morningside Assn.* v. *Planning & Zoning Board*, 162 Conn. 154, 161, 292 A.2d 893 (1972) (6.5 acre parcel satisfied first element of test for spot zoning).

[23] We note that if the planned development district is valid, the catering facility would no longer be a nonconforming use because it would be permitted activity in the planned development district, which has the effect of creating a new zone.

finding of abandonment, we take judicial notice of § 67.C.3 of the New Haven zoning ordinance, which provides that the discontinuance of a nonconforming use for nine consecutive months, or for a total of eighteen months during a three year period, constitutes prima facie evidence of an intent to abandon the nonconforming use. Although no updated finding of abandonment has been made, if, in fact, the nonconforming use had been abandoned by the time the defendants' application for a planned development district was considered, the approval of the district would establish a new nonconforming use and not, as argued by the defendants, replace one existing nonconforming use with another.

Even if we agreed with the partnership that the end result of the proposed planned development district was to replace one nonconforming use, the convalescent home, with another, the expanded parking lot, we still disagree with the partnership's claim that there would be no net change to the neighborhood's character, which has all of the indicia of a residential zone. Additionally, we note that our Supreme Court has held that when the holder of a nonconforming commercial use seeks to obtain land for parking, the new parking lot itself is an additional nonconforming use. *Raffaele* v. *Planning & Zoning Board of Appeals*, 157 Conn. 454, 462, 254 A.2d 868 (1969). Thus, under the proposed planned development district, there will still be two nonconforming uses in the residential area, the enlarged parking lot and the catering facility. It is a fundamental principle of zoning that nonconforming uses should not be expanded and that they be made to conform as soon as fairness and due process allows. The new planned development district would transform the two nonconforming uses into conforming uses and could allow further enlargement of both the parking lot and catering facility in the future. Thus, the granting of the planned

development district runs counter to the general zoning principle of the elimination of nonconforming uses set forth in § 67.A.3[24] of the New Haven zoning ordinance.

Finally, a convalescent home is less intrusive in nature than a catering facility and is a better fit for a residential neighborhood. The catering facility, with the potential booking of multiple functions on any given day, results in more traffic, congestion and noise than a convalescent home. The planned development district, created with a lack of standards that results in unlimited and unfettered discretion, appears to be contrary to the harmony of the neighborhood and, thus, could be considered spot zoning.

We conclude, therefore, that § 65 is not authorized under the 1925 special act or the broad language contained in General Statutes § 8-2. The negative effect of the lack of uniform standards for the planned development district results in an abandonment of Euclidian district zoning, which forms the basis and authority for the 1925 special act, article XXXI, §§ 177-188, of the New Haven charter and the New Haven zoning ordinance. Euclidian zoning mandates uniformity within districts while § 65 impermissibly permits the board of aldermen to place any use or structure into any planned development district as long as a minimum size requirement is met. Accordingly, we conclude that § 65 is not properly authorized by the legislature or the charter of New Haven and therefore is invalid.

The judgment is reversed and the case is remanded with direction to sustain the plaintiffs' appeal.

In this opinion the other judges concurred.

---

[24] Section 67.A.3 of the New Haven zoning ordinance provides: "It is a fundamental [principle] of zoning law that nonconformities are not to be expanded and that they should be abolished or reduced to conformity as quickly as the fair interests of the parties will permit. This principle is declared to be the intent of this ordinance."