## JEANNE RIVERS *v.* CITY OF NEW BRITAIN ET AL.
### (SC 17863)

Katz, Palmer, Vertefeuille, Zarella and Schaller, Js.

Argued October 25, 2007—officially released July 22, 2008

*Linda Clough,* for the appellant (plaintiff).

*Irena J. Urbaniak,* city attorney, for the appellee (named defendant).

*Opinion*

PALMER, J. Municipalities ordinarily have a duty of care with respect to the maintenance of public sidewalks, and, under General Statutes § 13a-149,[1] they are

---

[1] General Statutes § 13a-149 provides in relevant part: "Any person injured in person or property by means of a defective road or bridge may recover damages from the party bound to keep it in repair. No action for any such injury sustained on or after October 1, 1982, shall be brought except within two years from the date of such injury. No action for any such injury shall be maintained against any town, city, corporation or borough, unless written notice of such injury and a general description of the same, and of the cause thereof and of the time and place of its occurrence, shall, within ninety days thereafter be given to a selectman or clerk of such town, or to the clerk of such city or borough, or to the secretary or treasurer of such corporation. . . ."

liable for damages caused by a breach of that duty. Pursuant to General Statutes § 7-163a,[2] however, a municipality may adopt an ordinance that shifts to the owner of the land abutting a public sidewalk both the duty of care and liability with respect to the presence of snow and ice on the sidewalk.[3] This certified appeal requires us to determine whether an ordinance that a municipality adopts in accordance with § 7-163a relieves the municipality of liability when the landowner abutting the sidewalk is the state, which is shielded from liability under the doctrine of sovereign immunity unless that immunity has been waived. In the present case, the trial court rendered summary judgment for

"The word 'road' as used in [§ 13a-149] has usually been construed to include a sidewalk." *Hornyak* v. *Fairfield*, 135 Conn. 619, 621, 67 A.2d 562 (1949).

[2] General Statutes § 7-163a provides: "(a) Any town, city, borough, consolidated town and city or consolidated town and borough may, by ordinance, adopt the provisions of this section.

"(b) Notwithstanding the provisions of section 13a-149 or any other general statute or special act, such town, city, borough, consolidated town and city or consolidated town and borough shall not be liable to any person injured in person or property caused by the presence of ice or snow on a public sidewalk unless such municipality is the owner or person in possession and control of land abutting such sidewalk, other than land used as a highway or street, provided such municipality shall be liable for its affirmative acts with respect to such sidewalk.

"(c) (1) The owner or person in possession and control of land abutting a public sidewalk shall have the same duty of care with respect to the presence of ice or snow on such sidewalk toward the portion of the sidewalk abutting his property as the municipality had prior to the effective date of any ordinance adopted pursuant to the provisions of this section and shall be liable to persons injured in person or property where a breach of said duty is the proximate cause of said injury. (2) No action to recover damages for injury to the person or to property caused by the presence of ice or snow on a public sidewalk against a person who owns or is in possession and control of land abutting a public sidewalk shall be brought but within two years from the date when the injury is first sustained."

[3] "An abutting landowner, in the absence of statute or ordinance, ordinarily is under no duty to keep the public sidewalk in front of his property in a reasonably safe condition for travel." *Wilson* v. *New Haven*, 213 Conn. 277, 280, 567 A.2d 829 (1989).

the named defendant,[4] the city of New Britain (city), concluding that, because the city had adopted an ordinance pursuant to § 7-163a, it is not liable to the plaintiff, Jeanne Rivers, for injuries that she allegedly suffered after falling on an icy public sidewalk, even though the abutting landowner, the state, is shielded from liability by the doctrine of sovereign immunity. The Appellate Court affirmed the judgment of the trial court; *Rivers* v. *New Britain*, 99 Conn. App. 492, 499, 913 A.2d 1146 (2007); and we granted the plaintiff's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly affirm the trial court's . . . judgment based [on] its application of . . . § 7-163a?" *Rivers* v. *New Britain*, 281 Conn. 929, 918 A.2d 278 (2007). We conclude that when, as in the present case, the state owns the land abutting a public sidewalk, an ordinance adopted by a municipality under § 7-163a does not relieve the municipality of liability for damages caused by the presence of ice or snow on the sidewalk. Accordingly, we reverse the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "The plaintiff claimed that she suffered serious injuries on January 7, 2003, when she slipped and fell on ice and snow that had accumulated on a public sidewalk in front of 185 Main Street in New Britain. The property abutting the sidewalk is state owned property, which is used as part of Central Connecticut State University (university). Portions of that state owned property are leased to private businesses. The university had a contract with Lawn Ranger, LLC, to provide snow removal, sanding and application of ice melting services at the

---

[4] The plaintiff also named Stephen E. Korta II, the former commissioner of transportation, as a defendant. The trial court granted Korta's motion to dismiss, and he no longer is a party to the case.

subject property. The company provided services pursuant to that contract the day before the plaintiff fell.

"The plaintiff commenced this action against the [city], pursuant to . . . § 13a-149, and Stephen E. Korta [II, in his official capacity as] the commissioner of transportation, pursuant to General Statutes § 13a-144.[5] Korta filed a motion to dismiss, claiming that the plaintiff's action against him was barred by sovereign immunity because the sidewalk where the plaintiff fell was not part of the state highway system [and, therefore, the state had no duty to maintain it]. The plaintiff did not file an objection, and the court granted [Korta's] motion.

"The [city] filed an answer and a special defense. The special defense alleged that the [city] was not liable for the plaintiff's fall because it had adopted ordinance § 21-8.1c in January, 1996, in accordance with the provisions of § 7-163a. The language of the ordinance essentially mirrors the language of the statute. On January 30, 2006, the [city] filed a motion for summary judgment on the basis of the facts alleged in its special defense. The plaintiff filed an objection, claiming that the statute did not apply under the circumstances of this case. The court heard argument and . . . grant[ed] the [city's] motion." *Rivers* v. *New Britain,* supra, 99 Conn. App. 494–95.

The plaintiff appealed to the Appellate Court from the judgment of the trial court, claiming that the trial

---

[5] General Statutes § 13a-144 provides in relevant part: "Any person injured in person or property through the neglect or default of the state or any of its employees by means of any defective highway, bridge or sidewalk which it is the duty of the Commissioner of Transportation to keep in repair . . . may bring a civil action to recover damages sustained thereby against the commissioner in the Superior Court. No such action shall be brought except within two years from the date of such injury, nor unless notice of such injury and a general description of the same and of the cause thereof and of the time and place of its occurrence has been given in writing within ninety days thereafter to the commissioner. . . ."

court improperly had concluded that, because the city had adopted an ordinance in accordance with § 7-163a, it was not liable for the plaintiff's injuries even though the sidewalk at issue abuts state property. Id., 495. The plaintiff contended that the city is liable for failing to maintain the sidewalk when the abutting landowner is the state because § 7-163a does not waive the state's sovereign immunity with respect to the sidewalk, and because a municipality cannot impose liability on the state through the adoption of an ordinance. Id.

The Appellate Court agreed with the plaintiff that § 7-163a does not constitute a waiver of the state's sovereign immunity and that the ordinance that the city had adopted did not effect such a waiver. The court reasoned, however, that "those conclusions [did] not warrant the ultimate conclusion that the provisions of § 7-163a do not apply in this case." Id., 497–98. The court stated further that, "[i]n order to conclude that the provisions of § 7-163a do not apply, this court would have to read into those provisions an exception. We would have to determine that the shifting of liability does not occur if the owner of the land abutting the public sidewalk is the state of Connecticut. It is undisputed that no such language [can be] found in § 7-163a, and, therefore, we would have to add it by implication." Id., 498. Although the plaintiff urged the Appellate Court "to do so, claiming that the legislative history [of] the statute supports such a result"; id.; the court rejected the plaintiff's invitation, concluding that, because the language of § 7-163a is plain and unambiguous and does not yield absurd or unworkable results, under General Statutes § 1-2z,[6] consideration of extratextual evidence

[6] General Statutes § 1-2z provides: "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered."

of the meaning of the statute, including its legislative history,[7] was foreclosed.

In his dissent from the majority opinion of the Appellate Court, Judge Bishop first expressed his agreement with the majority that § 7-163a is "facially clear and unambiguous" and does not contain an implicit waiver of sovereign immunity. Id., 500 (*Bishop, J.*, dissenting). He also agreed with the majority that the language of § 7-163a clearly relieves a municipality of liability and shifts it to the abutting landowner. Id., 501 (*Bishop, J.*, dissenting). Judge Bishop also observed, however, that § 7-163a "has two principal facets: the shifting of liability and the responsibility for public safety."[8] Id. He concluded that § 7-163a is unworkable when the abutting landowner is the state because the public safety component of the statute cannot be effectuated. Id. Judge Bishop explained: "[B]ecause § 7-163a does not constitute a waiver of the state's immunity from liability, it is difficult to conceive how it can be implied from the statute that it imposes any duty on the state for

---

[7] The Appellate Court noted that the plaintiff had argued "that a literal construction of the statute will create confusion and inconsistencies not intended by the legislature. [The plaintiff] also argue[d] that if her only recourse is to file a claim with the claims commissioner pursuant to General Statutes § 4-141 et seq., her claim could be denied, and she might never have a hearing on the merits. She would then be treated differently from an individual who fell on a public sidewalk that did not abut property owned by the state." *Rivers* v. *New Britain*, supra, 99 Conn. App. 499. The Appellate Court concluded, however, that it was the role of the legislature, and not the court, to correct any perceived injustices resulting from the plain and unambiguous statutory language. Id.

[8] With respect to the public safety component of § 7-163a, Judge Bishop stated: "That § 7-163a has a public safety purpose cannot reasonably be debated. In discussing . . . § 13a-144, the state highway statute analogous to . . . § 13a-149 regarding municipal roads and sidewalks, [the] Supreme Court [has] noted that although the statute does not make the state an insurer of the safety of travelers, it does impose on the state the duty of reasonable care to keep roads in a reasonably safe condition for a reasonably prudent traveler. *Serrano* v. *Burns*, 248 Conn. 419, 426, 727 A.2d 1276 (1999)." *Rivers* v. *New Britain*, supra, 99 Conn. App. 504 (*Bishop, J.*, dissenting).

public safety regarding a sidewalk not located on state property. Thus, it is the inevitable consequence of the majority's holding that § 7-163a relieves the municipality of its public safety responsibility without shifting it to the abutting landowner because the abutter happens to be the state."[9] Id., 504 (*Bishop, J.*, dissenting).

Judge Bishop therefore concluded that, because the statute is unworkable when the state is the abutting landowner, § 1-2z does not bar the court from consulting the pertinent legislative history to determine whether the legislature intended to relieve the city of its duty of care and liability even when the abutting landowner is the state. Id., 500–501, 504 (*Bishop, J.*, dissenting). Judge Bishop stated that, on the basis of the legislative history, it is "plain that the intent of the General Assembly in enacting § 7-163a was to permit a municipality to pass an ordinance to shift the burden of liability regarding snow and ice on municipal sidewalks from the municipalities' taxpayers to abutting *private* property owners." (Emphasis added.) Id., 504 (*Bishop, J.*, dissenting). Accordingly, Judge Bishop concluded that, contrary to the determination of the trial court and the Appellate Court majority, the ordinance that the city had adopted in accordance with § 7-163a did not relieve it of liability for its alleged negligence in failing to remove the ice and snow from the sidewalk on which the plaintiff was injured. See id., 505 (*Bishop, J.*, dissenting).

---

[9] Judge Bishop also expressed doubt as to whether a plaintiff who is injured due to the accumulation of snow and ice on a sidewalk abutting state property has a viable claim with the claims commissioner under General Statutes § 4-141 et seq. See *Rivers* v. *New Britain*, supra, 99 Conn. App. 503 (*Bishop, J.*, dissenting). Specifically, Judge Bishop explained that, because the state has no common-law or statutory duty to maintain the sidewalk reasonably free of snow and ice, "it is not apparent . . . that the [claims] commissioner would or could honor such a claim in this instance." Id.

On appeal to this court following our granting of certification, the plaintiff urges us to reverse the judgment of the Appellate Court for the reasons set forth by Judge Bishop in his dissenting opinion. The city contends that we should affirm the judgment of the Appellate Court, albeit on a ground different from that relied on by the Appellate Court majority. Specifically, the city maintains that, although the Appellate Court majority correctly concluded that § 7-163a relieves the city of liability for the plaintiff's injuries, the court incorrectly determined that § 7-163a does not waive the state's sovereign immunity with respect to injuries caused by snow and ice on sidewalks abutting state property. In support of its contention, the city asserts that § 7-163a plainly and unambiguously imposes a duty of care and liability on all abutting landowners, including the state, and that, if the legislature had intended to exempt the state from the provisions of § 7-163a, it easily could have done so.

We conclude that § 7-163a does not waive the state's sovereign immunity from liability or suit. Consequently, we further conclude that § 7-163a imposes no duty or liability on the state with respect to municipal sidewalks that abut state property. We also agree with Judge Bishop that, although the language of § 7-163a is facially plain and unambiguous, its application yields an unworkable result when, as in the present case, the state is the abutting landowner because, under that factual scenario, neither the municipality nor the state has a duty to clear the sidewalk of ice and snow. In light of this untenable result, and because the pertinent legislative history indicates that § 7-163a was intended to authorize the promulgation of municipal ordinances that shift the responsibility for the removal of ice and snow on public sidewalks to abutting *private* landowners, we conclude that § 7-163a does not relieve the municipality of its duty of care or liability with respect to the accumulation

of snow and ice on a public sidewalk when the state is the abutting landowner.

As a preliminary matter, we set forth the applicable standard of review and the legal principles that govern our resolution of the plaintiff's claim. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . On appeal, we must determine whether the legal conclusions reached by the trial court are legally and logically correct and whether they find support in the facts set out in the memorandum of decision of the trial court. . . . Our review of the trial court's decision to grant [a] defendant's motion for summary judgment is plenary." (Citations omitted; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 6–7, 882 A.2d 597 (2005).

Whether § 7-163a relieves a municipality from liability for the presence of ice or snow on a public sidewalk when the state owns the land abutting the sidewalk presents a question of statutory interpretation over which our review is plenary. See, e.g., *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 294, 933 A.2d 256 (2007). "When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether

the language actually does apply. . . . In seeking to determine that meaning . . . § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered. . . . When a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and common law principles governing the same general subject matter . . . ." (Internal quotation marks omitted.) Id., 294–95.

Finally, our construction of § 7-163a is guided "by the well settled principle that when the state waives sovereign immunity by statute a party attempting to sue under the legislative exception must come clearly within its provisions, because [s]tatutes in derogation of sovereignty should be strictly construed in favor of the state, so that its sovereignty may be upheld and not narrowed or destroyed . . . . [When] there is any doubt about [the] meaning or intent [of a statute in derogation of sovereign immunity, it is] given the effect which makes the least rather than the most change in sovereign immunity. . . . The state's sovereign right not to be sued may be waived by the legislature, provided clear intention to that effect is disclosed by the use of *express terms* or by *force of a necessary implication.*" (Emphasis added; internal quotation marks omitted.) *Dept. of Public Works* v. *ECAP Construction Co.*, 250 Conn. 553, 558–59, 737 A.2d 398 (1999). Furthermore, as this court previously has recognized, "[s]overeign immunity is comprised of two concepts, immunity from liability and immunity from suit." *St. George* v. *Gordon*, 264 Conn. 538, 550, 825 A.2d 90 (2003). "Legisla-

tive waiver of a state's suit immunity merely establishes a remedy by which a claimant may enforce a valid claim against the state and subjects the state to the jurisdiction of the court. By waiving its immunity from liability, however, the state concedes responsibility for wrongs attributable to it and accepts liability in favor of a claimant" who may seek recovery against the state by filing a claim with the claims commissioner in accordance with General Statutes § 4-141 et seq. (Internal quotation marks omitted.) *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74, 79, 818 A.2d 758 (2003).

We begin our analysis of the plaintiff's claim by expressing our agreement with the conclusion of the Appellate Court that § 7-163a does not constitute a waiver of the state's sovereign immunity. Contrary to the assertion of the city, this conclusion is compelled by the fact that § 7-163a contains no language that expressly waives the state's sovereign immunity when the state is the abutting landowner. See, e.g., *Dept. of Public Works* v. *ECAP Construction Co.*, supra, 250 Conn. 558–59. Although it is true, as the city argues, that, on its face, § 7-163a applies to any "owner" of land abutting a public sidewalk and does not distinguish between private and public landowners, we will not read statutory language to effect a waiver of the state's sovereign immunity unless the legislature has manifested that intent "clearly and unequivocally . . . ." *Gordon* v. *H.N.S. Management Co.*, 272 Conn. 81, 105–106 n.28, 861 A.2d 1160 (2004). When the legislature intends to waive immunity from suit or liability, it expresses that intent by using explicit statutory language. See, e.g., General Statutes § 4-61 (a) (authorizing those who have entered into highway or public works contract with state to "bring an action against the state"); General Statutes § 5-141d (a) (requiring state to indemnify state officers or employees for financial losses resulting from certain legal claims); General Stat-

utes § 12-369 (expressly authorizing actions against state for purpose of quieting title to property); General Statutes § 12-572 (f) (allowing off-track betting facility operators having contracts with state to "bring an action against the state" to settle any disputed claims under contract); General Statutes § 13a-144 (imposing liability on state for injuries caused by defects in state highways, bridges and sidewalks that commissioner of transportation has duty to keep in repair); General Statutes § 13a-148 (imposing duty on state to pay costs of repair to municipal roads damaged by operation thereon of equipment used in construction of state highways); General Statutes § 52-556 (granting "right of action against the state to recover damages for" any injury to person or property caused by state employee negligently operating state owned motor vehicle); General Statutes § 53-39a (indemnifying state police officers for financial losses associated with defending certain legal actions and authorizing action against state to enforce right of indemnification). Section 7-163a contains no such clear and unequivocal language waiving the state's sovereign immunity when the state is the abutting landowner.

We note, moreover, that even when a statute creates a duty or liability of general applicability, the legislature ordinarily uses language that expressly subjects the state to that duty or liability. See, e.g., General Statutes § 46a-51 (10) (including within definition of term " '[e]mployer,' " for purposes of Connecticut Fair Employment Practices Act, "the state and all political subdivisions thereof"); General Statutes § 47a-1 (f) (" '[p]erson' means an individual, corporation, limited liability company, the state or any political subdivision thereof" for purposes of landlord and tenant law). Indeed, this court long has stated that, in the absence of express language indicating that a statutorily created duty applies to the state, the statutory provision will

not be construed as constituting a waiver of sovereign immunity. See, e.g., *State* v. *Kilburn*, 81 Conn. 9, 11, 69 A. 1028 (1908) (statutory language generally purporting to affect rights and liabilities of all persons will not be deemed to apply to state in absence of express statutory reference to state); see also *State* v. *Hartford*, 50 Conn. 89, 90 (1882).

Thus, in *Gordon* v. *H.N.S. Management Co.*, supra, 272 Conn. 82–83, 105, we concluded that the defendant, H.N.S. Management Company (H.N.S.), which operated buses owned by the state, was an arm of the state and, therefore, immune from liability for purposes of General Statutes §§ 14-29 (a)[10] and 38a-336 (a),[11] which together impose on the "owner" or "lessee" of certain types of motor vehicles a duty to procure liability insurance, including uninsured and underinsured motorist coverage. In concluding that the doctrine of sovereign immunity entitled H.N.S. to dismissal of the claims that had been brought against it by the plaintiffs, each of whom had suffered injuries in an accident involving a state owned bus operated by H.N.S.; id., 83–84; we observed that "[t]he plaintiffs [had] not identified any

[10] General Statutes § 14-29 (a) provides in relevant part: "The commissioner shall not register any motor bus, taxicab, school bus, motor vehicle in livery service, student transportation vehicle or service bus and no person may operate or cause to be operated upon any public highway any such motor vehicle until the owner or lessee thereof has procured insurance or a bond satisfactory to the commissioner, which insurance or bond shall indemnify the insured against any legal liability for personal injury, the death of any person or property damage, which injury, death or damage may result from or have been caused by the use or operation of such motor vehicle described in the contract of insurance or such bond. . . ."

[11] General Statutes § 38a-336 (a) provides in relevant part: "(2) Notwithstanding any provision of this section to the contrary, each automobile liability insurance policy issued or renewed on and after January 1, 1994, shall provide uninsured and underinsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless any named insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. . . ."

express waiver by the state of its sovereign immunity in [§§ 14-29 and 38a-336] . . . ." Id., 105. Although a literal reading of §§ 14-29 and 38a-336 would have rendered the requirements of those provisions applicable to the state and its agent, H.N.S., we concluded that H.N.S. was immune from liability under principles of sovereign immunity because there is nothing in the statutory language to indicate, clearly and unequivocally, that the state is subject to those provisions. Id., 105–106 n.28 ("the plaintiffs have not identified any statute or other instrument in which the state clearly and unequivocally has indicated that it is subject to the provisions of the uninsured [and underinsured] motorist statutes"); see also *Dept. of Public Works* v. *ECAP Construction Co.*, supra, 250 Conn. 558–59 (legislature may waive state's sovereign immunity "provided clear intention to that effect is disclosed by the use of express terms" [internal quotation marks omitted]). Because § 7-163a does not contain express language clearly stating its applicability to the state, it cannot be construed to impose either liability or a duty on the state.[12]

---

[12] Imposing a duty on the state under § 7-163a would be tantamount to imposing liability on the state because the breach of that duty would give rise to liability. Indeed, this court expressly has acknowledged that a statute that imposes a duty on the state represents a waiver of the state's sovereign immunity from liability with respect to a breach of that duty. See *St. George* v. *Gordon*, supra, 264 Conn. 550–51 (indicating that General Statutes § 5-141d, which imposes duty of indemnification on state, waives state's sovereign immunity from liability); *Martinez* v. *Dept. of Public Safety*, supra, 263 Conn. 83 (construing General Statutes [Rev. to 2002] § 53-39a, which imposed duty of indemnification on state, as waiving state's sovereign immunity from liability). In such circumstances, that is, when the state waives liability, "the plaintiff's remedy for enforcement of his claim is with the claims commissioner [under § 4-141 et seq.]." *Martinez* v. *Dept. of Public Safety*, supra, 85. In the present case, however, because § 7-163a does not effect a waiver of the state's sovereign immunity from liability, it cannot be construed as imposing a duty on the state any more than it can be construed as imposing liability on the state.

We note, in addition, that, although it may appear unnecessary for the legislature to have imposed both a duty of care *and* liability on the abutting landowner under § 7-163a, the reason for doing so derives from this court's decision in *Willoughby* v. *New Haven*, 123 Conn. 446, 453–54, 197 A. 85

In view of the fact that § 7-163a does not impose a duty on the state to remove snow and ice from a public sidewalk when the state owns the property abutting the sidewalk, Judge Bishop concluded that § 7-163a is "unworkable" within the meaning of § 1-2z, as applied to that scenario, because the municipality is relieved of its duty to remove snow and ice from the sidewalk but that duty is not transferred to the state.[13] *Rivers* v. *New Britain,* supra, 99 Conn. App. 501 (*Bishop, J.,* dissenting). Thus, neither the state nor the municipality

(1937), in which we held that, because a landowner was not liable at common law for failing to remove ice and snow from a public sidewalk abutting the landowner's property, a municipality that sought to impose such liability was required to do so explicitly. We explained our conclusion as follows: "The assistance to the city which is obtained under ordinances making it the duty of abutters to remove snow and ice from the sidewalks adjoining their property relieves, to that extent, the burdens of labor and expense which it otherwise would necessarily, in discharge of its municipal duties, be subjected to, but the city is in no degree exonerated from its obligations in these particulars in consequence of the adoption of [such] ordinances. The remedy of persons injured for damages sustained in consequence of snow and ice upon a sidewalk remains exclusively against the city. . . . The distinction between cases [in which] dangerous conditions have been created by individuals and in which they are held liable for the consequences under their common-law obligations as creators of a nuisance, and those relating to the consequences following neglect of a duty imposed by statute or ordinance to maintain, repair, or clear sidewalks, is manifest and radical. The decided weight of authority is that [there is] no liability to travelers or the city for injuries [that result] from failure to comply with such statute or ordinance. . . . *Abutting owners have only been held liable for injuries from defective sidewalks where under charter provisions they were not only charged with the duty of keeping sidewalks in repair but also expressly made liable for injuries occasioned by defective condition thereof.*" (Citations omitted; emphasis added; internal quotation marks omitted.) Id.

[13] The Appellate Court majority did not expressly address Judge Bishop's conclusion that applying § 7-163a to the facts of the present case leads to an unworkable result even though the key public safety component of the statute is defeated when, as in the present case, the state owns the land abutting the sidewalk. The Appellate Court majority did note, however, that any confusion, inconsistency or other perceived injustice that might result from the application of the literal language of § 7-163a should be addressed by the legislature and not remedied by the courts. *Rivers* v. *New Britain,* supra, 99 Conn. App. 499.

is responsible for keeping the sidewalk clear of snow and ice. Because the word "unworkable" is not defined in the relevant statutory provisions, including § 1-2z itself, "we turn to General Statutes § 1-1 (a), which provides in relevant part: 'In the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language . . . .' We look to the dictionary definition of the [term] to ascertain [its] commonly approved meaning."[14] *R.C. Equity Group, LLC* v. *Zoning Commission*, 285 Conn. 240, 254 n.17, 939 A.2d 1122 (2008); see also *Groton* v. *Mardie Lane Homes, LLC*, 286 Conn. 280, 288, 943 A.2d 449 (2008) ("[i]f a statute or regulation does not sufficiently define a term, it is appropriate to look to the common understanding of the term as expressed in a dictionary" [internal quotation marks omitted]). The American Heritage Dictionary defines "unworkable" as "not capable of being put into practice successfully."[15] American Heritage Dictionary of the

---

[14] The dissent, quoting from this court's recent opinion in *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 497, 923 A.2d 657 (2007), acknowledges that "[t]he meaning of 'unworkable' as used in § 1-2z must be ascertained consistently with 'the dictates of § 1-2z just as we would if we were construing any other statute.' " As we expressly stated in *Hummel*, however, we discern the "commonly approved usage" of a word, as § 1-1 (a) requires, by resort to the dictionary definition of the term. *Hummel* v. *Marten Transport, Ltd.*, supra, 498 (consulting dictionary for definition of term "text" in § 1-2z). Contrary to the requirement of § 1-1 (a) and our long-standing practice of ascertaining the commonly approved meaning of a word by looking to its dictionary definition, the dissent purports to discern the meaning of "unworkable" for purposes of § 1-2z by reviewing various cases in which this court has applied that term under its common-law authority. The dissent, however, provides no reason for deviating from our well established rule pursuant to which we ascertain the ordinary meaning of a term by consulting the dictionary, and we know of no such justification.

[15] Although Webster's Third New International Dictionary does not define the term "unworkable," it does define the term "workable" as "capable of being put into successful operation . . . ." This would suggest that Webster's Third New International Dictionary would define "unworkable" as *not* capable of being put into successful operation, which is similar to the definition of "unworkable" found in the American Heritage Dictionary.

English Language (3d Ed. 1992). Because the important public safety feature of § 7-163a is thwarted when the state is the abutting landowner—that is, no one has a duty to remove snow and ice that accumulates on the public sidewalk—we agree with Judge Bishop that § 7-163a is unworkable under those circumstances.[16]

Accordingly, under § 1-2z, we are free to examine extratextual evidence of the meaning of a statute,

[16] The dissent asserts that our conclusion regarding the unworkability of § 7-163a is predicated in part on the fact that "some injured persons might be left with what the majority considers to be an inadequate remedy." The dissent further contends that our purported concern for the inadequacy of the remedy available under § 7-163a is unwarranted because a person who is injured on a public sidewalk that abuts state property may file a claim with the claims commissioner. With respect to the dissent's first assertion, our resolution of the plaintiff's claim does not rely on the fact that a person injured on a public sidewalk abutting state property does not have an adequate remedy. As we have explained, our conclusion that the statute is unworkable is predicated on our determination that a primary purpose of the statute, that is, shifting the duty for removing snow and ice from public sidewalks away from municipalities and to abutting landowners, cannot be effectuated when the state owns the abutting property. With respect to the dissent's second assertion, we disagree that a person who is injured on a sidewalk abutting state property has a viable claim with the claims commissioner under § 4-141 et seq. A landowner whose property abuts a public sidewalk has no common-law duty to remove snow and ice from the sidewalk; see, e.g., *Wilson* v. *New Haven*, 213 Conn. 277, 280, 567 A.2d 829 (1989); and, as the dissent acknowledges, § 7-163a does not impose such a duty on the state. Because the claims commissioner is authorized to approve claims only when equity and justice so warrant; see, e.g., General Statutes § 4-160 (a); we, like Judge Bishop, see no reason why the claims commissioner would or even could approve a claim against the state arising out of the state's failure to discharge a duty that it does not have. See *Rivers* v. *New Britain*, supra, 99 Conn. App. 502–503 (*Bishop, J.*, dissenting). In other words, despite the claims commissioner's broad statutory discretion, we must presume that the commissioner will exercise that discretion in accordance with statutory requirements, and we discern no basis for the commissioner to make an award when, as in the present case, the state has no responsibility for removing snow and ice from a public sidewalk. Nevertheless, because § 7-163a is unworkable when the state is the abutting landowner in view of the fact that the public safety component of § 7-163a is thwarted, we need not rely on the lack of a viable remedy as a basis for concluding that § 7-163a is unworkable when the state is the abutting landowner.

including its legislative history, when application of the statute's plain and unambiguous language leads to an unworkable result.[17] See General Statutes § 1-2z. It is evident from the pertinent legislative history of Public Acts 1981, No. 81-340 (P.A. 81-340), codified at General Statutes (Rev. to 1983) § 7-163a, that the purpose of the legislature in adopting the duty and liability shifting provisions of § 7-163a was to relieve municipalities of responsibility with respect to the removal of snow and ice on municipal sidewalks and to shift that responsibility to abutting private landowners. For example, during the floor debate in the House of Representatives on the bill that subsequently was enacted as P.A. 81-340, the principal proponent of the bill, Representative Alfred J. Onorato, explained: "What the bill does is give those municipalities . . . [that] adopt an ordinance . . . the right to make property homeowners who are in control or possession, or own the sidewalk in front of their houses, the duty to keep them clear of snow and ice. . . .

"There [is] some concern that there [will] be an added cost . . . to the consumer. This is not so, at least in my opinion in that the [property owner pays] for this now under his [homeowner's] policy . . . ." 24 H.R. Proc., Pt. 21, 1981 Sess., pp. 7051–52, remarks of Repre-

[17] The dissent contends that we have violated § 1-2z by identifying public safety as a primary purpose of § 7-163a. Specifically, the dissent maintains that, under § 1-2z, a statutory purpose can be gleaned only from extratextual sources, and, because § 7-163a is plain and unambiguous, § 1-2z prohibits us from consulting any such sources. We categorically reject the dissent's reading of § 1-2z. In identifying the public safety purpose of § 7-163a, we have not considered any extratextual sources; that purpose, rather, is perfectly obvious from the statutory language itself, and there is nothing in § 1-2z that prohibits us from ascertaining the purpose of § 7-163a, or any other statute, from its plain language. It is readily apparent that § 7-163a transfers the duty of snow and ice removal from the municipality to the abutting landowner so that the abutting landowner will be responsible for maintaining the sidewalk in a safe condition. Indeed, the dissent does not suggest any other possible purpose.

sentative Onorato; see also id., p. 7058, remarks of Representative Onorato ("[This bill] imposes no burden on [property owners] that they're not now already paying. They're already paying for their [homeowner's] insurance which is an extension of their yard at this point . . . ."); id., p. 7067, remarks of Representative Joseph J. Farricielli (supporting bill because, inter alia, accidents on certain portion of sidewalk already covered under homeowner's insurance policy); 24 S. Proc., Pt. 10, 1981 Sess., p. 3274, remarks of Senator Eugene A. Skowronski (opposing amendment to bill and referring to abutting landowner as "the private landowner").

Even opponents of the bill expressed their understanding that the bill effected a change in the law that was targeted at private homeowners. See, e.g., 24 H.R. Proc., Pt. 19, 1981 Sess., p. 6540, remarks of Representative Richard O. Belden (He opposed the bill on the ground that the legislature would be "telling the private property owner that he is now going to be responsible for plowing the sidewalk. Perhaps next year [the legislature will] make him responsible for his half of the road."); id., pp. 6540–41, remarks of Representative Belden ("this is a horrendous bill and not in the interests of the private property owners in the [s]tate of Connecticut"); 24 H.R. Proc., Pt. 21, 1981 Sess., p. 7054, remarks of Representative William H. Hofmeister (opposing bill because "the liability will fall onto the homeowner"); id., p. 7060, remarks of Representative Arthur A. Brouillet (opposing bill because shifting of liability "to the individual homeowners" likely will cause increase in homeowners' "insurance rates"); id., p. 7063, remarks of Representative Gerald P. Crean, Jr. ("I totally disagree that this will not, in fact, cost the homeowners more money").

The conclusion that the purpose of § 7-163a was to shift responsibility for snow and ice removal from municipalities to abutting private property owners is

buttressed by the legislative history surrounding two proposed amendments to the bill, one of which was adopted and the other of which was rejected. The bill required proof that the abutting landowner's negligent failure to clear ice or snow from the sidewalk was the "sole proximate cause" of any injuries suffered by the plaintiff. An Act Concerning Municipality Liability for Ice and Snow on Public Sidewalks, Substitute House Bill No. 6706, 1981 Sess. Senate Amendment Schedule A, which was adopted, removed the word "sole" from before the term "proximate cause" so that a plaintiff only need prove that the abutting landowner's negligence was a proximate cause of his or her injury. In introducing that amendment on the floor of the House of Representatives, Representative Onorato explained that, "by deleting the word 'sole', it brings [the bill] into the current side of the law . . . [in] negligence cases . . . ." 24 H.R. Proc., Pt. 19, 1981 Sess., p. 6537, remarks of Representative Onorato. Senate Amendment Schedule C, which was rejected, sought to require "that when an injury occurs . . . a written notice of the injury and a general description be given to the owner or person in possession and control of the land [abutting the sidewalk on which the injury occurred]." 24 S. Proc., Pt. 10, 1981 Sess., p. 3271, remarks of Senator George L. Gunther. Senator Howard T. Owens, Jr., however, who had introduced the amendment to remove the word "sole" from the bill, opposed the notice requirement on the ground that, under the bill as originally proposed, "the landowner becomes liable . . . under a general theory of liability that has been long established . . . ." Id., p. 3272, remarks of Senator Owens. Senator Owens further stated that, "if someone falls down inside your house or someone falls down in your backyard or is hurt in an automobile accident, there certainly is no written notice requirement given as a condition precedent to the suit." Id. It is significant that the sole proxi-

mate cause and notice requirements were rejected because those two requirements are part of § 13a-144; see footnote 5 of this opinion; see also *White* v. *Burns*, 213 Conn. 307, 336, 567 A.2d 1210 (1990) ("[s]ole proximate cause remains the standard of causation under § 13a-144"); the statutory provision pursuant to which the state may be held liable for its negligent maintenance of a highway or sidewalk that it has a duty to maintain.

In sum, an ordinance adopted in accordance with § 7-163a has a dual function: it relieves the municipality of the duty and liability with respect to the removal of snow and ice from public sidewalks, and it shifts that duty and liability to the abutting landowner. See, e.g., *Dreher* v. *Joseph*, 60 Conn. App. 257, 261–62, 759 A.2d 114 (2000) (observing that § 7-163a "not only permits a [municipality] to adopt an ordinance that requires abutting landowners to remove snow and ice on public sidewalks . . . but also empowers the [municipality] to shift liability to the abutting landowner for injuries caused by a violation of the ordinance"). When the state owns the land abutting the public sidewalk, however, it has no duty or liability with respect to the removal of snow and ice from the sidewalk. In such circumstances, therefore, neither the party ordinarily responsible for maintaining the sidewalk, that is, the municipality, nor the abutting landowner, namely, the state, would bear responsibility for clearing the sidewalk of snow and ice.[18] We cannot conceive of any reason why the legisla-

[18] The dissent states that, "[b]ecause there is no statute requiring sidewalks along all public highways within municipalities, the public would be no worse off with an uncleared sidewalk than with no sidewalk at all." The dissent then asks, "[b]ecause it is neither absurd nor unworkable to have no sidewalk at all, how can it be absurd or unworkable to have an uncleared one?" The answer to the dissent's question is simple. When a municipality places a sidewalk next to a road, it invites pedestrians to use the sidewalk, and those pedestrians reasonably expect that the sidewalk, which has been constructed for their use, will be maintained in a reasonably safe condition. Pedestrians will use the sidewalk accordingly. The municipality extends no such invitation to pedestrian traffic when there is no sidewalk adjacent to the road, and pedestrians, therefore, have no reasonable expectation that

ture would have intended such a result in light of the obvious adverse public safety ramifications. Moreover, the legislative history of § 7-163a reveals that the intent of the legislature in enacting § 7-163a was to shift the duty and liability for snow and ice removal to private abutting property owners. Indeed, there is nothing in that legislative history to suggest that it was within the contemplation of the legislature that the municipality would be relieved of its duty and liability with respect to the accumulation of snow and ice on public sidewalks when that duty and liability cannot be shifted to the abutting landowner because that landowner is the state. We therefore conclude that the ordinance adopted by the city pursuant to § 7-163a did not relieve the city of its duty and liability with respect to the removal of snow and ice that allegedly had accumulated on the sidewalk on which the plaintiff fell.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court for further proceedings according to law.

In this opinion KATZ, VERTEFEUILLE and ZARE-LLA, Js., concurred.

SCHALLER, J., dissenting. I agree with two basic premises of the majority opinion. First, I agree that General Statutes § 7-163a (b) provides plainly and

the undeveloped area next to the road will be maintained in a safe condition for their use. In such circumstances, we have no reason to presume that pedestrians will traverse that undeveloped area. Thus, contrary to the dissent's claim, there is a most significant distinction between no sidewalk and an uncleared sidewalk: reasonable pedestrians generally will not use the former, and, therefore, they will not be at risk of injury; reasonable pedestrians will feel perfectly free to use the latter, however, thereby subjecting themselves to an increased risk of injury. Thus, the premise of the dissent's assertion, that is, that an uncleared sidewalk is no more dangerous than no sidewalk at all, is fatally flawed. Consequently, so is its conclusion.

unambiguously that the "city . . . *shall not be liable
to any person injured . . .* caused by the presence of
ice or snow on a public sidewalk unless such municipal-
ity is the owner or person in possession and control of
land abutting such sidewalk . . . ." (Emphasis added.)
Second, I agree that nothing in the language of § 7-163a
constitutes an explicit or implicit waiver of sovereign
immunity.[1] I disagree, however, with the majority's con-
clusion, which is contrary to the plain and unambiguous
language of § 7-163a, that the ordinance adopted by
the named defendant, the city of New Britain (city), in
accordance with § 7-163a, does not relieve the city of
liability when the landowner abutting the city sidewalk
is the state. The majority reaches this conclusion in
two steps. First, it determines that the plain meaning
of the statute yields an "unworkable" result because it
fails to provide for public safety by failing to transfer
to the state as a landowner both the duty to clear an
abutting sidewalk and liability for failure to do so, and
the result is that the plaintiff, Jeanne Rivers, lacks a
direct right of action against the abutting owner in the
present case. Second, on the basis of its conclusion
that the plain language yields an unworkable result, the

---

[1] The majority agrees with the Appellate Court's conclusion that § 7-163a
is not explicit enough to constitute a waiver of sovereign immunity. *Rivers*
v. *New Britain*, 99 Conn. App. 492, 497, 913 A.2d 1146 (2007). "There is, of
course, a distinction between sovereign immunity from suit and sovereign
immunity from liability. Legislative waiver of a state's suit immunity merely
establishes a remedy by which a claimant may enforce a valid claim against
the state and subjects the state to the jurisdiction of the court. By waiving
its immunity from liability, however, the state concedes responsibility for
wrongs attributable to it and accepts liability in favor of a claimant." (Internal
quotation marks omitted.) *Martinez* v. *Dept. of Public Safety*, 263 Conn. 74,
79, 818 A.2d 758 (2003). In determining that § 7-163a does not constitute a
waiver of the state's sovereign immunity, neither the majority nor the Appel-
late Court discussed the distinction between immunity from suit and immu-
nity from liability. I conclude that neither type of immunity was waived in
the present case either by "the use of express terms or by force of a necessary
implication." (Internal quotation marks omitted.) *Duguay* v. *Hopkins*, 191
Conn. 222, 228, 464 A.2d 45 (1983).

majority consults the legislative history of the statute and reasons that its history supports the conclusion that the legislature intended that § 7-163a would not relieve the city of liability when the landowner abutting the city sidewalk is the state. I disagree with the analysis of the majority in both of these steps and address each in turn.

I agree with the trial court and the Appellate Court majority that § 7-163a in no uncertain terms relieves the city of liability by virtue of enacting ordinance § 21-8.1c. *Rivers* v. *New Britain*, 99 Conn. App. 492, 497–98, 913 A.2d 1146 (2007). By enacting that ordinance, the city transferred its duty to clear the abutting sidewalk to the state. Because the doctrine of sovereign immunity shields the state, absent its consent, from liability and suit, the plaintiff's remedy lies with the claims commissioner or with an action against the contractor that provided the snow removal services on behalf of the state.[2]

Because the statute is plain and unambiguous, the key to the majority's approach in avoiding the application of the plain language of the statute is the language in General Statutes § 1-2z that authorizes the court, in ascertaining the meaning of the statute, to look beyond the plain language to the legislative history if the plain meaning of the text yields "unworkable results . . . ." The "unworkable [result]" yielded by application of the plain meaning of the text of the statute, according to the majority, is that the statute fails to provide for the public safety because it does not allocate a duty to clear the sidewalk when the abutting landowner is the state.

I begin with two observations. First, the meaning of the term "unworkable" as used in § 1-2z is itself a ques-

---

[2] It was undisputed that the state hired a contractor to provide snow removal services for the sidewalk abutting the state owned property, and that these services were provided one day prior to when the plaintiff was injured.

tion of statutory interpretation. Second, the question of its meaning in the context of § 1-2z is one that we have not yet addressed, since our focus in the threshold inquiry mandated by § 1-2z most often has been aimed at determining whether the statutory term or terms at issue are plain and unambiguous. If we are to widen that focus to include inquiries as to whether an application of undisputedly plain and unambiguous language yields an unworkable result, we should employ the established tools of statutory interpretation in defining the term "unworkable" as used in § 1-2z in order to further the legislative purpose underlying that statute.

The meaning of "unworkable" as used in § 1-2z must be ascertained consistently with "the dictates of § 1-2z just as we would if we were construing any other statute." *Hummel* v. *Marten Transport, Ltd.*, 282 Conn. 477, 497, 923 A.2d 657 (2007). Because the statute does not define "unworkable," and its meaning is not plain and unambiguous, it is appropriate to look to extratextual sources to determine its meaning. The legislative history does not reveal the meaning of "unworkable." Although dictionary definitions of the term "unworkable" are pertinent, it is appropriate to look to our prior use of the term in order to discern its meaning in the statute because we have employed the term repeatedly in the context of statutory interpretation prior to the passage of § 1-2z. *Considine* v. *Waterbury*, 279 Conn. 830, 844, 905 A.2d 70 (2006) ("the legislature is presumed to be aware of prior judicial decisions involving common-law rules" [internal quotation marks omitted]). My review of our case law reveals that we have employed the term "unworkability" in two primary senses, either to signify that an interpretation of a statute would yield an impracticable result or an absurd one.

The most common way in which we have used the term "unworkability" has been to mean "impracticabil-

ity." The cases in which we have rejected an interpretation of a statute as impracticable generally have involved scenarios in which, if we accepted the proposed interpretation, some person, entity or agency would be required by statute to comply with a standard that was not capable of being applied under the known facts, too indefinite to provide any guidance, or simply not capable of being carried out at all under the facts of the case. In other words, we rejected the proposed interpretation because it literally could not have been carried out by those obligated to apply the statute. We did not use the term "impracticable" to mean that we considered the policies underlying the statutes to be unwise, unsound or undesirable. Rather, our focus was on the practicability of carrying out the statutes. For example, in *Manners* v. *Waterbury*, 86 Conn. 573, 575–76, 86 A. 14 (1913), we concluded that unless a statute or charter provision required it, the defendant city was under no constitutional obligation to give personal notice to an owner of land that had not been taken or injured, of a hearing before the department of public works (department) whose only duty was to prepare a survey and layout of an improvement proposed by the board of alderman. *Manners* involved the laying out and construction of a new street by the city, which assessed special benefits against the plaintiff, an owner of land in the neighborhood of, but not abutting, the proposed street. Id., 574–75. The plaintiff challenged the assessment on the ground, inter alia, that he never received notice from the department of the proceedings before it. Id. The trial court found for the plaintiff and annulled the assessment, and the city appealed. Id., 574. In reversing the trial court, this court considered the structure of the assessment proceedings, as mandated by the city charter. That is, the court considered it significant that, according to the charter, the department was required to conduct its survey and to com-

plete the layout of the proposed improvement prior to any determination by the city's bureau of assessment as to which property owners would "be made subject to the payment of benefits . . . ." Id., 576. Requiring the department to give notice to possibly affected property owners would have rendered the "proceeding prescribed by the legislature a practically unworkable one," the court reasoned, because it would have required the department to "forecast" which property owners would be identified by the bureau of assessment as persons affected by the proposed public improvement. Id.

Again focusing on the concept of workability as impracticability, in *State* v. *Cain*, 223 Conn. 731, 733, 613 A.2d 804 (1992), we addressed the question of "whether a 911 emergency telephone call is a 'statement' within the meaning of Practice Book § 749 (2) [now Practice Book § 40-15 (2)]."[3] Practice Book § 40-15 (2), defines the term " 'statement,' " for purposes of the rules of practice concerning prosecutorial disclosure, as including: "A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." See also *State* v. *Cain*, supra, 733 n.1. Although we did "not regard the language of [Practice Book § 40-15 (2)] to be so absolutely clear that further interpretation [was] unnecessary," we also stated that "even if we were to conclude that the language of [Practice Book § 40-15 (2)] is clear, a literal interpretation of that section would lead to an unworkable result." Id., 745. Specifically, we noted that tape recordings of 911 telephone calls were "subject to

[3] Although an earlier revision of the Practice Book, with a different numbering system, was applicable when this court decided *State* v. *Cain*, supra, 223 Conn. 733 n.1, the relevant language remains unchanged. For convenience, we refer to the current revision of the Practice Book.

the regulations regarding preservation and disposition of such records promulgated by the public records administrator pursuant to General Statutes § 11-8." Id., 741. Because of financial and administrative concerns, the public records administrator had determined that municipalities were required to preserve recordings of 911 telephone calls for thirty days, after which they could erase the tape and reuse it. Id., 742–43. If we had interpreted the term " 'statement' " in Practice Book § 40-15 (2), however, to include recordings of 911 telephone calls, "each municipality would be required by the provisions of the Practice Book to preserve indefinitely tapes of all 911 emergency telephone calls, because it would be impossible for the municipality to determine at the instant of each such call whether it would be required to produce the tape recording at some time in the future." Id., 746–47. The onerous burden this would have placed on municipalities would have yielded an unworkable result, because it would have been burdensome or unwieldy—in short, impracticable. Id., 747–48. After we arrived at that conclusion, we then looked to the history and purpose of Practice Book § 40-15 (2), and concluded ultimately that recordings of 911 telephone calls were not statements pursuant to Practice Book § 40-15 (2). Id., 753–55.

We applied the rule in the criminal context in *State* v. *Ledbetter*, 263 Conn. 1, 818 A.2d 1 (2003), in which we rejected the defendant's contended interpretation of the meaning of the term "parent" as used in General Statutes § 46b-137 (a), which renders inadmissible a child's confession to a police officer unless that confession was made in the presence of a parent. The defendant claimed that the term included "only a parent who has a sufficiently close relationship with his or her child to provide meaningful guidance to that child . . . ." *State* v. *Ledbetter*, supra, 11 n.19. We rejected that interpretation because it was not supported by the statutory

language, and added that, "even if we assume that the defendant's interpretation did find support in the statutory language, that interpretation would be unworkable inasmuch as it would require the police to ascertain, in each case, whether a particular parent-child relationship satisfies the nebulous standard proposed by the defendant." Id.

In *State* v. *Brown*, 242 Conn. 389, 390–93, 699 A.2d 943 (1997), the issue before us was whether the speedy trial provisions of General Statutes § 54-82m and Practice Book §§ 956B and 956C, now Practice Book §§ 43-39 and 43-40, required the dismissal of a criminal action against a defendant when the reason that the trial failed to commence within thirty days of the defendant's speedy trial motion was because the defendant's attorney was engaged in a trial in another case. We first looked to the language of § 54-82m, noting that it "requires that the rules adopted by the judges of the Superior Court, 'to assure a speedy trial for any person charged with a criminal offense . . . shall provide that (1) in any case in which a plea of not guilty is entered . . . [and] when such defendant is incarcerated in a correctional institution of this state pending . . . trial . . . the trial of such defendant shall commence within eight months from the filing date of the information . . . or from the date of arrest, whichever is later; and (2) if a defendant is not brought to trial within the time limit set forth in subdivision (1) and a trial is not commenced within thirty days of a motion for a speedy trial made by the defendant at any time after such time limit has passed, the information . . . shall be dismissed. Such rules shall include provisions to identify periods of delay caused by the action of the defendant, or the defendant's inability to stand trial, to be excluded in computing the time limits set forth in subdivision (1).' " Id., 403, quoting General Statutes § 54-82m. We then noted that, although § 54-82m expressly authorizes

the court to identify periods of delay in computing the time limits set forth in subsection (1) of the statute, no such authority is granted to the court to extend the thirty day period set forth in subdivision (2). *State* v. *Brown*, supra, 404–405. We also noted that the rules of practice drew the same distinction between the initial eight month period governed by subsection (1) of § 54-82m, and the thirty day period governed by subsection (2) of the statute, and allowed the court to identify periods of delay in computing the time limits with respect to subsection (1) only. Id., 405. We concluded, however, that a "literal interpretation" of the statutory language would yield unworkable results, such as leaving the court with the choice of either granting a dismissal or requiring a criminal defendant to proceed to trial without his original attorney, and would even require the court to grant a dismissal if the defendant fled the jurisdiction. Id., 405–406. In summarizing, we stated, "if a literal application of the language of the statute would generate a clash between the defendant's rights to a speedy trial and to adequate representation, the literal application must yield to the power of the court to make a reasonable accommodation between those two rights . . . ." Id., 406.

As a final illustration of the concept of impracticability, in *State Water Commission* v. *Norwich*, 141 Conn. 442, 107 A.2d 270 (1954), the question before us was whether a statute that empowered the water commission to enforce any of its orders issued to a municipality by bringing an action in the Superior Court, and also authorized the court subsequently to issue an " 'appropriate decree or process' "; id., 443; included a grant of authority to the court, not only to enforce such orders, but also to modify an order to permit enforcement where the date of compliance already had passed. Id., 444. The court concluded that the statute did include such a grant of authority, reasoning that such a modifi-

cation was a "[condition] . . . necessary to the adequate enforcement of the order." Id., 445. The court explained: "It is logical to assume that the legislature intended that the court should have the power to act effectively and not that it should issue a useless, unworkable decree." Id. In other words, we rejected the interpretation of the statute that would have granted the court a power that it would not have been able to carry out, because that interpretation would have granted the court the power to issue an " 'appropriate' " decree, but deprived the court of the authority to make the modification necessary to render the decree " 'appropriate.' " Id.

The second sense in which we have used the term "unworkable" is to mean "absurd." In the cases relying on this sense of "unworkable," we essentially have employed a reductio ad absurdum argument, illustrating that the proposed interpretation of a statute would yield a ridiculous result, and rejecting the interpretation on the premise that the legislature never would have intended such an absurd result. For example, in *Pecora* v. *Zoning Commission*, 145 Conn. 435, 144 A.2d 48 (1958), superseded by statute on other grounds as stated in *Campion* v. *Board of Aldermen*, 85 Conn. App. 820, 833–34, 859 A.2d 586 (2004), rev'd on other grounds, 278 Conn. 500, 899 A.2d 542 (2006), we considered whether the statutory provision that zoning regulations must " 'be made in accordance with a comprehensive plan and . . . be designed to lessen congestion in the streets' "; id., 440; barred a zoning commission from "changing a tract [of land] from a residence A to a commercial B-C zone, thereby authorizing its use for a regional shopping center." Id., 437. We concluded that an interpretation barring the proposed change on the ground that there would be greater traffic flow would render the statute unworkable, because under that interpretation, "a residence area could seldom, if ever,

be changed to a business or industrial use, regardless of the recommendations in a comprehensive plan, since almost necessarily there would be a resultant increase in street traffic in the immediate area." Id., 440. This result, so inconsistent with the broad discretion accorded to zoning commissions, is one that is clearly absurd.

Applying this common-law background to the interpretation of the term "unworkable" in § 1-2z, it is appropriate to define that term under our most commonly employed usage, as meaning impracticable, particularly since § 1-2z includes absurdity as an independent basis for going beyond the plain language of a statute to consult extratextual sources. Nothing in the majority opinion persuades me that the interpretation of § 7-163a in accordance with the plain language of the statute— which relieves the city of liability even under the facts of the present case, where the abutting landowner is the state—renders the statute unworkable or impracticable.

The majority begins with a definition of "unworkable" that is essentially the same as that arrived at by a review of our case law. That is, relying solely on dictionary definitions, the majority defines the term as " 'not capable of being put into practice successfully' " or " 'not capable of being put into successful operation . . . .' " The majority's application of the term, however, is not consistent with those definitions. Rather than demonstrating that the statute cannot be carried out, in any practicable way, pursuant to the plain statutory language, the majority relies chiefly on its concern that some sidewalks might not be cleared and that some injured persons might be left with what the majority considers to be an inadequate remedy. The majority concludes that the city's authority to divest itself of liability, coupled with the state's immunity from liability or suit, is inconsistent with the majority's interpretation

of the purpose underlying the statute, that is, to secure the public safety and to enable injured parties to bring legal action. The majority concludes, in effect, that the statutory language used by the legislature failed to enact the legislative policy that it intended to carry out. Put another way, the policy that is reflected in the language is, in some ways, incomplete, unwise or undesirable.

It is important at this juncture to emphasize the purpose of the "unworkability" inquiry. The point of § 1-2z is that, unless the plain and unambiguous language of the statute yields unworkable or absurd results, extratextual sources may not be consulted in ascertaining the meaning of the statute. In order to arrive at its threshold conclusion, however, that the statute is rendered unworkable if interpreted in accordance with the plain language of the statute, a conclusion that would allow the court, under the strictures of § 1-2z, to consult extratextual sources, the majority relies on an extratextual source, namely, what it presumes is the legislative purpose underlying the statute, to promote public safety. See *Windels* v. *Environmental Protection Commission*, 284 Conn. 268, 294–95, 933 A.2d 256 (2007) ("[w]hen a statute is not plain and unambiguous, we also look for interpretive guidance to the legislative history and circumstances surrounding its enactment, *to the legislative policy it was designed to implement*, and to its relationship to existing legislation and common law principles governing the same general subject matter" [emphasis added; internal quotation marks omitted]). In this case, in which the plain language expressly shifts liability from the town to abutting owners, without exception, the majority's rationale, in effect, circumvents the purpose of § 1-2z, which is to prohibit courts from considering extratextual sources in ascertaining the meaning of a statute until *after* the threshold inquiry, and only if that inquiry reveals that the language is not plain and unambiguous or that the

plain language yields absurd or unworkable results. The fact that legislative policy underlying a statute may be unworkable in the way that it is carried out does not mean that the statute is unworkable for purposes of disregarding the plain language.

Although the outcome of this case should turn solely on the interpretation of the statute, and not on the remedy available to the plaintiff, I note that the office of the claims commissioner today performs a similar function to that performed by a petition to the king under English common law. We examined the genesis of the office of the claims commissioner in *Miller* v. *Egan*, 265 Conn. 301, 318, 828 A.2d 549 (2003). "The office of the claims commissioner was created by Public Acts 1959, No. 685. Prior to 1959, a claimant who sought to sue the state for monetary damages, in the absence of a statutory waiver by the state, had but one remedy— namely, to seek relief from the legislature, either in the form of a monetary award or permission to sue the state. See Conn. Joint Standing Committee Hearings, Appropriations, Pt. 3, 1959 Sess., pp. 919–20." *Miller* v. *Egan*, supra, 318. Pursuant to General Statutes § 4-158 (a), the claims commissioner "may (1) order that a claim be denied or dismissed, (2) order immediate payment of a just claim in an amount not exceeding seven thousand five hundred dollars, (3) recommend to the General Assembly payment of a just claim in an amount exceeding seven thousand five hundred dollars, or (4) authorize a claimant to sue the state, as provided in [General Statutes §] 4-160." It is worth emphasizing that, under § 4-160 (a), "[w]hen the Claims Commissioner deems it just and equitable, the Claims Commissioner may authorize suit against the state on any claim which, in the opinion of the Claims Commissioner, presents an issue of law or fact under which the state, were it a private person, could be liable."[4] The question that

---

[4] It is not useful to engage in speculation, as the majority does, as to how the claims commissioner would exercise that discretion.

would be before the claims commissioner, therefore, would not be limited to common-law duties to remove snow and ice, as the majority argues, but would also include any statutory liability that the state would have incurred, "were it a private person . . . ." General Statutes § 4-160 (a). The limit to common-law liability that the majority reads into § 4-160 (a) simply is not present in the language of the statute.

Finally, I note that the result of applying the plain language of § 7-163a to the facts of this case, namely, the fact that the plaintiff must rely on the discretion of the claims commissioner in obtaining relief, is a by-product of the very nature of sovereign immunity: it leaves some people with a less than ideal remedy against the state. It is, however, a mistake to decide the present case on the basis of the plaintiff's access to a remedy. Nor is it proper for us to construe statutory language that is undesirable or even unwise contrary to its plain meaning in order to correct an apparent *wrong*, whether it be a deficiency in legislative policy or an instance of unfairness. If it can be said that a close reading of the statute results in unfairness to persons such as the plaintiff, it can also be said that the result of the majority's interpretation will be unfair to the city in the present case. No one could reasonably contend that the city should have known, by a reading of § 7-163a, that it had a duty to clear the sidewalk in question. Not only did the plain language of the statute relieve the city of such a duty, but, in addition, the state had undertaken the duty of clearing the sidewalk by hiring a contractor. If the job was improperly done, the fault was the state's, the city having no role in the process. Under the circumstances, it hardly seems fair that the city and its taxpayers are *left holding the bag*.

If the legislature has indeed failed to provide for a public safety need, the public must look to the legislature to remedy that omission, if it so chooses. Even

assuming that the legislature has failed to specify who has the obligation to clear the sidewalk in this case, the failure to specify the obligation and corresponding liability does not make the result absurd, bizarre or unworkable. A legislative policy that is incomplete or even unwise is not necessarily absurd or unworkable. Because there is no statute requiring sidewalks along all public highways within municipalities, the public would be no worse off with an uncleared sidewalk than with no sidewalk at all. Because it is neither absurd nor unworkable to have no sidewalk at all, how can it be absurd or unworkable to have an uncleared one?[5]

I turn now to the second issue on which I part from the majority opinion. Although the majority does find legislative history that it determines supports the conclusion that the legislature, in adopting Public Acts 1981, No. 81-340, now codified at § 7-163a, was concerned about shifting liability from the municipality to the private abutting owners, the legislative history does not support the majority's interpretation because it is silent as to what happens when the abutting owner is the state. The legislative history is, at best, inconclusive. The majority makes much of references in the floor debate of the bill to "private landowner[s]"; 24 S. Proc., Pt. 10, 1981 Sess., p. 3247, remarks of Senator Eugene A. Skowronski; and "homeowners." 24 H.R. Proc., Pt. 21, 1981 Sess., pp. 7051–52, remarks of Representative Alfred J. Onorato. Much of the debate, in fact, centered on whether the bill would impose a financial burden on homeowners. All that the legislative history reveals is what is already evident from the facts of the present case—that the legislature was not thinking about the

---

[5] The majority contends that an uncleared sidewalk presents a greater issue of "unworkability" than a road that has no abutting sidewalk at all because the city has, by constructing the sidewalk, "invite[d]" pedestrians to use it. In deciding whether to use an uncleared public sidewalk, however, surely reasonable pedestrians will be governed by their perceptions of risk rather than their assumptions about responsibility.

possibility of the abutting landowner being the state. I do not believe that we should ignore the plain and unambiguous language of the statute in order to construe it according to our conception of how it might have been drafted. I would leave the issue for the legislature to decide.

For the foregoing reasons, I respectfully dissent.